**Nos. 23-1953 & 23-2241**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### NATIONAL LABOR RELATIONS BOARD

                         **Petitioner/Cross-Respondent**

v.

### STARBUCKS CORPORATION
### d/b/a STARBUCKS COFFEE COMPANY

                         **Respondent/Cross-Petitioner**

_____

### ON APPLICATION FOR ENFORCEMENT AND
### CROSS-PETITION FOR REVIEW OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD

_____

### BRIEF FOR
### THE NATIONAL LABOR RELATIONS BOARD

_____

                         **KIRA DELLINGER VOL**
                         *Supervisory Attorney*

                         **ERIC WEITZ**
                         *Attorney*

                         **National Labor Relations Board**
                         **1015 Half Street SE**
                         **Washington, D.C. 20570**
                         **(202) 273-0656**
                         **(202) 273-3757**

**JENNIFER A. ABRUZZO**
        *General Counsel*
**PETER SUNG OHR**
        *Deputy General Counsel*
**RUTH E. BURDICK**
        *Deputy Associate General Counsel*
**DAVID HABENSTREIT**
        *Assistant General Counsel*

**National Labor Relations Board**

# TABLE OF CONTENTS

**Headings**                                                                                                                        **Page(s)**

Statement of jurisdiction ...................................................................................1

Statement of the issues....................................................................................2

Statement of related cases...............................................................................2

Statement of the case.......................................................................................3

   I.   The Board's findings of fact.......................................................................3

      A.   Nowakowska and Bussiere begin raising shared concerns and
organizing coworkers at Starbucks's Broad & Washington store ........... 3

      B.   Starbucks retaliates against Nowakowska and Bussiere ......................... 4

      C.   Starbucks discharges Nowakowska and Bussiere .................................... 6

   II.  Procedural history ....................................................................................8

   III. The Board's conclusions and Order ........................................................ 8

Summary of argument......................................................................................9

Standard of review ........................................................................................11

Argument........................................................................................................11

   I.   The Court lacks jurisdiction to entertain Starbucks's challenge to
the removability of the Board's administrative law judges ......................11

      A.   The Act contains a strict jurisdictional bar precluding the Court
from entertaining Starbucks's new argument ....................................... 12

      B.   The Court need not decide the constitutional question given
that Starbucks suffered no harm ........................................................... 15

      C.   The Board's administrative law judges are properly subject to
removal protections granting them adjudicative independence ............. 17

# **TABLE OF CONTENTS**

**Headings – cont'd**                                                                        **Page(s)**

II.   The Board is entitled to summary enforcement of its Order as to its
      uncontested unfair-labor-practice findings...................................................21

III.  Substantial evidence supports the Board's findings that Starbucks
      violated Section 8(a)(3) and (1) of the Act by retaliating against and
      discriminatorily discharging Nowakowska and Bussiere ...........................22

      A.   Starbucks unlawfully reduced Nowakowska's scheduled hours ........... 24

      B.   Starbucks unlawfully discharged Nowakowska.................................... 27

      C.   Starbucks unlawfully discharged Bussiere ............................................ 30

IV.   The Board did not abuse its discretion by ordering Starbucks to
      offer Nowakowska and Bussiere reinstatement ...........................................33

      A.   Starbucks was already aware that Nowakowska and Bussiere
           were recording conversations prior to discharging them ....................... 35

      B.   Nowakowska and Bussiere's recording activities were protected
           by the Act and could not serve as a valid basis for discharge ............... 37

V.    The Board did not abuse its discretion by ordering Starbucks to
      make Nowakowska and Bussiere whole for all direct or foreseeable
      pecuniary harms suffered as a result of the unfair labor practices...............40

      A.   The Board's remedy effectuates the policies of the Act and is
           consistent with decades of well-established precedent .......................... 42

      B.   Starbucks's attempts to redefine the Board's statutory
           remedial authority are baseless and contrary to precedent.................... 45

           1.   The Act does not limit make-whole relief to backpay...................... 45

           2.   The Act does not distinguish between law and equity...................... 49

# **TABLE OF CONTENTS**

**Headings – cont'd**                                                                         **Page(s)**

C.  The Court lacks jurisdiction to entertain Starbucks's meritless
    Seventh Amendment argument.................................................................. 51

D.  The Court lacks jurisdiction to entertain Starbucks's meritless
    nondelegation argument........................................................................... 54

E.  The Court lacks jurisdiction to entertain Starbucks's meritless
    due process argument............................................................................... 56

Conclusion ........................................................................................................58

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Advanced Disposal Services East, Inc. v. NLRB,*
  820 F.3d 592 (3d Cir. 2016)......................................................... 12-13

*Albemarle Paper Co. v. Moody,*
  422 U.S. 405 (1975) ..........................................................................47

*Amalgamated Utility Workers v. Consolidated Edison Co.,*
  309 U.S. 261 (1940) .........................................................................44

*Arbah Hotel Corp. v. NLRB,*
  845 F. App'x 181 (3d Cir. 2021).....................................................21

*Atlantic City Electric Co. v. NLRB,*
  5 F.4th 298 (3d Cir. 2021) ..............................................38, 49, 51, 54

*Atlantic Limousine, Inc. v. NLRB,*
  243 F.3d 711 (3d Cir. 2001)............................................................42

*Atlas Roofing Co. v. OSHRC,*
  430 U.S. 442 (1977) ................................................................... 52-54

*Axon Enterprise, Inc. v. FTC,*
  598 U.S. 175 (2023) .........................................................................14

*BMW of North America, Inc. v. Gore,*
  517 U.S. 559 (1996) .........................................................................57

*Calcutt v. FDIC,*
  37 F.4th 293 (6th Cir. 2022), *rev'd per curiam,*
  143 S. Ct. 1317 (2023) ............................................................... 17-18

*Carr v. Saul,*
  141 S. Ct. 1352 (2021) .....................................................................14

*Celotex Corp.,*
  259 NLRB 1186 (1982)....................................................................29

*Collins v. Yellen,*
  141 S. Ct. 1761 (2021) ............................................................ 15-16, 19

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                                          **Page(s)**

*Collins v. Department of Treasury*,
    83 F.4th 970 (5th Cir. 2023) ................................................................16

*CFPB v. Law Offices of Crystal Moroney PC*,
    63 F.4th 174 (2d Cir. 2023) ......................................................... 16-17

*David Stanley Consultants v. OWCP*,
    800 F. App'x 123 (3d Cir. 2020)........................................................13

*Decker Coal Co. v. Pehringer*,
    8 F.4th 1123 (9th Cir. 2021) ......................................................16, 18

*E.C. Waste, Inc. v. NLRB*,
    359 F.3d 36 (1st Cir. 2004)......................................................... 21-22

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015).............................................................57

*Fibreboard Paper Products v. NLRB*,
    379 U.S. 203 (1964) ........................................................................42

*Franks v. Bowman Transportation Co.*,
    424 U.S. 747 (1976) ........................................................................47

*Free Enterprise Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................. 17-20

*Free Enterprise Fund v. PCAOB*,
    537 F.3d 667 (D.C. Cir. 2008) .........................................................18

*Granfinanciera S.A. v. Nordberg*,
    492 U.S. 33 (1989) ..........................................................................50

*Great-West Life & Annuity Insurance Co. v. Knudson*,
    534 U.S. 204 (2002) ........................................................................50

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988) ........................................................................50

*Gundy v. United States*,
    139 S. Ct. 2116 (2019)....................................................................55

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                     **Page(s)**

*Hedstrom Co. v. NLRB*,
    629 F.2d 305 (3d Cir. 1980)...................................................................11, 19, 42

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ...............................................................................19

*Hunter Douglas, Inc. v. NLRB*,
    804 F.2d 808 (3d Cir. 1986)....................................................................22-23

*ILGWU v. Quality Mfg. Co.*,
    420 U.S. 276 (1975) ...............................................................................14, 56

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022), *cert. granted*,
    143 S. Ct. 2688 (2023) ...........................................................................17-18

*Jolie Belts Co.*,
    265 NLRB 1130 (1982)............................................................................25

*K&R Contractors LLC v. Keene*,
    86 F.4th 135 (4th Cir. 2023) ..................................................................15-16

*Kenrich Petrochemicals, Inc. v. NLRB*,
    907 F.2d 400 (3d Cir. 1990)....................................................................11, 42, 45

*LIUNA v. Foster Wheeler Energy Corp.*,
    26 F.3d 375 (3d Cir. 1994)......................................................................56

*Lee Brass Co.*,
    316 NLRB 1122 (1995), *enforced mem.*,
    105 F.3d 671 (11th Cir. 1996)................................................................43

*Local 60, United Brotherhood of Carpenters v. NLRB*,
    365 U.S. 651 (1961) ...............................................................................42

*Local 277, International Brotherhood of Painters v. NLRB*,
    717 F.2d 805 (3d Cir. 1983)....................................................................32

# TABLE OF AUTHORITIES

**Cases – cont'd**                                                      **Page(s)**

*Lou's Transport, Inc.*,
  366 NLRB No. 140, 2018 WL 3570875 (2018), *enforced*,
  945 F.3d 1012 (6th Cir. 2019) ..............................................................43

*Mertens v. Hewitt Associates*,
  508 U.S. 248 (1993) ...............................................................48, 50

*Mistretta v. United States*,
  488 U.S. 361 (1989) .........................................................................55

*Morrison v. Olson*,
  487 U.S. 654 (1988) .........................................................................20

*Napleton 1050, Inc.*,
  367 NLRB No. 6, 2018 WL 4694098 (2018), *enforced*,
  976 F.3d 30 (D.C. Cir. 2020).............................................................43

*NLRB v. Hudson Transit Lines, Inc.*,
  429 F.2d 1223 (3d Cir. 1970)............................................................41

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) .......................................................................53-55

*NLRB v. Louton, Inc.*,
  822 F.2d 412 (3d Cir. 1987)..............................................................43

*NLRB v. Omnitest Inspection Services, Inc.*,
  937 F.2d 112 (3d Cir. 1991)..............................................................23

*NLRB v. Seven-Up Bottling Co.*,
  344 U.S. 344 (1953) .........................................................................51

*NLRB v. Stackpole Carbon Co.*,
  128 F.2d 188 (3d Cir. 1942)..............................................................44

*NLRB v. Strong*,
  393 U.S. 357 (1969) .........................................................................42

*NLRB v. Transportation Management Corp.*,
  462 U.S. 393 (1983) ............................................................. 22-23, 46

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                    **Page(s)**

*NLRB v. UFCW, Local 23*,
    484 U.S. 112 (1987) ........................................................19

*Oil States Energy Services LLC v. Greene's Energy Group LLC*,
    138 S. Ct. 1365 (2018) ....................................................53

*Phelps Dodge Corp. v. NLRB*,
    313 U.S. 177 (1941) ............................... 33, 42, 45-46, 51

*Pittsburgh Plate Glass Co. v. NLRB*,
    313 U.S. 146 (1941) ........................................................55

*Pollard v. E.I. du Pont de Nemours & Co.*,
    532 U.S. 843 (2001) ........................................................47

*Quick v. NLRB*,
    245 F.3d 231 (3d Cir. 2001).............................................43

*Rood Trucking Co.*,
    342 NLRB 895 (2004)...............................................22, 31

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ........................................................57

*Shepard v. NLRB*,
    459 U.S. 344 (1983) ........................................................44

*Smith v. Board of Governors*,
    73 F.4th 815 (10th Cir. 2023) .................................... 13-14

*SNE Enterprises, Inc.*,
    344 NLRB 673 (2005)......................................................57

*Somerset Valley Rehabilitation & Nursing Center*,
    358 NLRB 1361 (2012), *readopted*,
    362 NLRB 961 (2015), *enforced*,
    825 F.3d 128 (3d Cir. 2016).........................23-24, 29, 33-35

# <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                                      **Page(s)**

*Somerset Valley Rehabilitation & Nursing Center v. NLRB*,
   825 F.3d 128 (3d Cir. 2016)....................................................12-14, 22-23, 28, 34

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984) ...........................................................................14, 42

*Terson Co. v. Bakery Drivers, Local 194*,
   739 F.2d 118 (3d Cir. 1984)........................................................................53

*Thryv, Inc.*,
   372 NLRB No. 22, 2022 WL 17974951 (2022)..............40-41, 43-44, 48, 52, 56

*U.S. Marine Corp. v. NLRB*,
   944 F.2d 1305 (7th Cir. 1991) ................................................................22, 24

*Unbelievable, Inc.*,
   318 NLRB 857 (1995), *enforced in part*,
   118 F.3d 795 (D.C. Cir. 1997) ....................................................................46

*UAW v. Russell*,
   356 U.S. 634 (1958) ...................................................................................44

*United States v. Burke*,
   504 U.S. 229 (1992) ...............................................................................47-48

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) .....................................................................................13

*Virginia Electric & Power Co. v. NLRB*,
   319 U.S. 533 (1943) .....................................................................44-46, 51, 53

*Whitman v. American Trucking Associations*,
   531 U.S. 457 (2001) ...................................................................................55

*Whole Foods Market, Inc.*,
   363 NLRB 800, *enforced*,
   691 F. App'x 49 (2d Cir. 2017).................................................................37-38

*Wiener v. United States*,
   357 U.S. 349 (1958) ...................................................................................19

# TABLE OF AUTHORITIES

**Cases – cont'd**                                                                                  **Page(s)**

*Wright Line*,
    251 NLRB 1083 (1980), *enforced*,
    662 F.2d 899 (1st Cir. 1981)............................................. 22-24, 26, 28-29, 31-33

*Zimmermann v. NLRB*,
    749 F. App'x 148 (3d Cir. 2019)...........................................................................40

**Statutes**                                                                                        **Page(s)**

National Labor Relations Act
    (29 U.S.C. §§ 151, et seq.)

Section 1 (29 U.S.C. § 151) ...............................................................................55
Section 3(d) (29 U.S.C. § 153(d))......................................................................19
Section 7 (29 U.S.C. § 157) ...............................................................................22
Section 8(a)(1) (29 U.S.C. § 158(a)(1)).......................................... 2, 8, 22-24, 27, 30
Section 8(a)(3) (29 U.S.C. § 158(a)(3)).......................................... 2, 8, 22-24, 27, 30
Section 10(a) (29 U.S.C. § 160(a)) ................................................................... 1-2
Section 10(c) (29 U.S.C. § 160(c)) ......................................... 13, 19, 42, 44-50, 55
Section 10(e) (29 U.S.C. § 160(e)) ............2, 9, 12-14, 17, 32, 38-39, 49, 51, 54, 56
Section 10(f) (29 U.S.C. § 160(f)) .................................................................2, 17

Civil Service Reform Act of 1978
    (5 U.S.C. §§ 1101, et seq.)

Section 7521(a) (5 U.S.C. § 7521(a)) ..................................................................20

Equal Employment Opportunity Act,
    Pub. L. 92-261, 86 Stat. 103 (1972) ..................................................................48

**Regulations**                                                                                     **Page(s)**

29 C.F.R. § 102.26 ..............................................................................................20

**Other Authorities**                                                                               **Page(s)**

Brief for Petitioner, *SEC v. Jarkesy*, No. 22-859 (U.S. Aug. 28, 2023) .................20

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

### Nos. 23-1953 & 23-2241

———————————

## NATIONAL LABOR RELATIONS BOARD

**Petitioner/Cross-Respondent**

v.

## STARBUCKS CORPORATION
## d/b/a STARBUCKS COFFEE COMPANY

**Respondent/Cross-Petitioner**

———————————

## ON APPLICATION FOR ENFORCEMENT AND
## CROSS-PETITION FOR REVIEW OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

———————————

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

———————————

## STATEMENT OF JURISDICTION

This case is before the Court on the application of the National Labor

Relations Board ("the Board") for enforcement, and the cross-petition of Starbucks

Corp. d/b/a Starbucks Coffee Co. ("Starbucks") for review, of a Decision and

Order issued on February 13, 2023, and reported at 372 NLRB No. 50.  The Board

had jurisdiction over the proceeding below pursuant to Section 10(a) of the

National Labor Relations Act, 29 U.S.C. §§ 151, et seq., as amended ("the Act").

29 U.S.C. § 160(a).  The Board's Order is final, and this Court has jurisdiction pursuant to Section 10(e) and (f) of the Act.  29 U.S.C. § 160(e), (f).  Venue is proper as Starbucks committed unfair labor practices in Pennsylvania.  The petition and application are timely as the Act provides no time limit for such filings.

## STATEMENT OF THE ISSUES

1.   Whether the Court has jurisdiction to entertain Starbucks's untimely challenge to the Board's administrative law judges.

2.   Whether the Board is entitled to summary enforcement of its Order as to its uncontested unfair-labor-practice findings.

3.   Whether substantial evidence supports the Board's findings that Starbucks violated Section 8(a)(3) and (1) of the Act by retaliating against and discriminatorily discharging two employees.

4.   Whether the Board abused its discretion by ordering Starbucks to offer the discriminatorily discharged employees reinstatement.

5.   Whether the Board abused its discretion by ordering Starbucks to make the discriminatorily discharged employees whole for all direct or foreseeable pecuniary harms suffered as a result of the unfair labor practices.

## STATEMENT OF RELATED CASES

Board counsel is unaware of any related cases.

# STATEMENT OF THE CASE

## I. THE BOARD'S FINDINGS OF FACT

### A. Nowakowska and Bussiere Begin Raising Shared Concerns and Organizing Coworkers at Starbucks's Broad & Washington Store

Starbucks operates more than 25,000 retail coffee stores worldwide, including a store located near the intersection of Broad Street and Washington Avenue in Philadelphia, Pennsylvania. (JA.17; JA.107.)[1] Starbucks's frontline employees, known as baristas, are responsible for preparing beverages and food, processing payments, and cleaning and stocking the store. (JA.17; JA.159.)

Employees Echo Nowakowska and TJ Bussiere were hired by Starbucks in 2018 and assigned to the Broad & Washington store shortly after it opened in January 2019. (JA.17; JA.159, JA.317.) In June, they began meeting regularly with coworkers to discuss shared concerns about working conditions and to explore the possibility of organizing a union. (JA.18; JA.161-68, JA.317.)

In July, Nowakowska and Bussiere coordinated an in-store demonstration highlighting shared complaints about the store manager and other working conditions. (JA.18-19; JA.167-74, JA.318.) During a subsequent meeting, a senior manager told them that the demonstration had been "on the verge" of violating Starbucks's policies, and that making such demands was in conflict with

---

[1] "JA" references are to the joint appendix. References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

3

Starbucks's "mission and values."  (JA.19; JA.190-96, JA.1498, JA.1514.)
Around the same time, Nowakowska and Bussiere began making audio recordings
of certain meetings with managers.  (JA.36-37; JA.294-95, JA.320, JA.353-54.)

Throughout the weeks and months that followed, Nowakowska and Bussiere
continued to actively discuss workplace concerns with Starbucks employees across
the Philadelphia area and to agitate for unionization, including by maintaining a
robust social-media presence that Starbucks monitored.  (JA.19-20; *e.g.*, JA.208,
JA.252-56, JA.335-43, JA.367.)

### B.    Starbucks Retaliates Against Nowakowska and Bussiere

Starbucks brought in David Vaughan as the new store manager in early
September.  (JA.19; JA.207.)  Vaughan was informed of the ongoing employee
activism at the store by his direct superior, district manager Brian Dragone.
(JA.19; JA.515-16.)

On October 22, a Starbucks manager observed Nowakowska and Bussiere
attending a meeting of Philadelphia-area Starbucks employees to discuss union
organizing.  (JA.20; JA.358-59.)  Two days later, operations coach Melissa
Maimon reported to upper management that "the energy in [the Broad &
Washington store] is ramping up again" and that she expected things to "get a little
dicey over the next few weeks."  (JA.20; JA.806-07.)  Senior managers noted
internally that they were "keeping an even closer eye on" the store, and that they

4

wanted to be "tactical" but to "move with urgency." (JA.20; JA.806-07.)  The next day, Vaughan denied Bussiere opportunities to earn extra money by training new employees based on unspecified "negative behavior." (JA.20; JA.324-25, JA.824.)

On October 29, Dragone and Vaughan issued Nowakowska a warning for failing to serve drinks properly. (JA.20-21; JA.222-30, JA.1428.)  The next day, Dragone sent an email to senior managers noting that two of the four employees who "instigated" the demonstration in July had resigned, and that the two who remained—Nowakowska and Bussiere—continued to "constantly complain[]" to coworkers but had recently received disciplinary warnings. (JA.21; JA.827.)

On November 18, and for the next five weeks, Vaughan cut Nowakowska's scheduled hours by more than 30 percent. (JA.21; JA.237-38, JA.665-70.)  When Nowakowska inquired, Vaughan stated he would not schedule her if she was going to cause a "disruption." (JA.21; JA.237-40.)  Several days later, Dragone and Vaughan separately met with Bussiere to issue him a warning for failing to follow instructions and for becoming a "distraction" to coworkers by complaining about Vaughan. (JA.22; JA.330, JA.1439.)  Dragone told Bussiere to cease distracting coworkers and to maintain a positive work environment. (JA.22; JA.330-31.)

On November 25, Nowakowska and Bussiere coordinated another in-store demonstration to present a copy of an unfair-labor-practice charged filed against Starbucks. (JA.22; JA.247-50, JA.334.)  On November 27, Vaughan prepared, but

did not issue, a warning alleging that Nowakowska failed to follow instructions and raised her voice at him.  (JA.22-23; JA.458, JA.1431.)

On December 2, an article appeared in *Philadelphia Inquirer* highlighting Nowakowska and Bussiere's efforts to organize Starbucks employees.  (JA.23; JA.789-95.)  The next day, while Bussiere was picking up a shift at another area store, a Starbucks manager attempted to eavesdrop on Bussiere's conversations with coworkers and later asked the employees what Bussiere had said, before reporting the incident to upper management.  (JA.23-24; JA.342-43, JA.810-11.)

On December 18, Vaughan met with Nowakowska regarding the allegations in the unissued November 27 warning and required her to sign a statement of company policies.  (JA.24; JA.257-58, JA.796-97.)

## C.   Starbucks Discharges Nowakowska and Bussiere

On January 18, 2020, Nowakowska and Bussiere attempted to assist a coworker facing discharge.  (JA.24; JA.268-69, JA.347-50.)  On January 25, Vaughan sent an email to Dragone "venting" about Nowakowska and Bussiere and stating he was "willing to deal with the backlash that would come with terminating the two of them because it doesn't matter if we terminate now or [one] year from now they will still call [the] NLRB."  (JA.24-25; JA.819.)

On January 26, Starbucks discharged Nowakowska on the grounds that she had provided poor customer service during two incidents the previous week.

(JA.25; JA273-75, JA.1436.)  During one incident, Nowakowska asked a customer for confirmation that the customer's drink contained enough ice.  (JA.25; JA.275-77.)  During the other incident, in response to a customer making several requests for free items, Nowakowska remarked, "Now you want free butter?" while ringing up the customer's order.  (JA.25; JA.277-81.)  Starbucks did not ask Nowakowska for her version of events, contrary to its normal practice.  (JA.34; JA.280.)

On February 5, Vaughan issued Bussiere a warning for insubordination on the stated grounds that Bussiere had attempted to enter the back of the store while Vaughan was meeting with another employee.  (JA.25; JA.347-50, JA.1453.)

On February 17, shift supervisor Leanne Bissell overheard Bussiere talking to a coworker about previous in-store demonstrations and a pending lawsuit against Starbucks.  (JA.26-27; JA.350.)  Bissell texted Vaughan asking what to do about Bussiere's "negative" conversation.  (JA.26-27; JA.974-75.)  Bissell and Vaughan separately counseled Bussiere that he could not discuss "negativity" or "drama" about Starbucks or its managers.  (JA.26-27; JA.350-51, JA.697, JA.816.)

In mid-February, Bussiere heard a rumor that a coworker might be facing termination.  (JA.27; JA.286-91, JA.352, JA.379-80.)  Bussiere subsequently warned the coworker about what he had heard, and asked if the coworker needed any assistance.  (JA.27; JA.352-53.)  On February 26, after learning of this conversation, Starbucks discharged Bussiere on the grounds that he "knowingly

communicat[ed] false information" to the coworker.  (JA.27; JA.352, JA.584, JA.1456.)  The termination notice referenced Bussiere's prior discipline for "disrupting" coworkers.  (JA.27; JA.1456.)

## II.   PROCEDURAL HISTORY

The Board's General Counsel issued a complaint alleging Starbucks violated Section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3), by unlawfully retaliating against and discharging Nowakowska and Bussiere, and by engaging in a host of additional unfair labor practices.  (JA.16.)  An administrative law judge oversaw an evidentiary hearing and issued a recommended decision finding that Starbucks committed nearly all of the alleged violations.  (JA.15-42.)

## III.   THE BOARD'S CONCLUSIONS AND ORDER

On February 13, 2023, the Board (Chairman McFerran, Members Wilcox and Prouty) issued a Decision and Order affirming the judge's decision and finding that Starbucks committed fifteen violations of Section 8(a)(1) and (3), all of which targeted Nowakowska and Bussiere's extensive protected activities.  (JA.7-13.)

The Board's Order requires Starbucks to cease and desist from its unfair labor practices and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of their statutory rights.  (JA.13.)  The Board's Order further requires Starbucks to offer Nowakowska and Bussiere reinstatement, make them whole for any loss of earnings or benefits and for any

other direct or foreseeable pecuniary harms suffered as a result of the unfair labor practices, and post a remedial notice.  (JA.13-14.)

On June 30, 2023, the Board (Chairman McFerran, Members Wilcox and Prouty) issued an order, reported at 372 NLRB No. 102, denying a motion for reconsideration filed by Starbucks.  (JA.43-47.)

## SUMMARY OF ARGUMENT

The Board's unfair-labor-practice findings are supported by overwhelming evidence of Starbucks's animus toward the statutorily protected activities of two employees, Nowakowska and Bussiere, who engaged in an extensive course of conduct advocating for coworkers and who became the public faces of a nascent campaign to organize Starbucks employees in the Philadelphia area.  The Board found Starbucks committed fifteen separate unfair labor practices targeting both employees—twelve of which Starbucks does not contest on review—including unlawfully discharging them after its attempts to coerce them failed.

On review, Starbucks first attempts to evade responsibility for its unlawful actions by interjecting numerous meritless arguments—including constitutional attacks on the Board's administrative law judges and the scope of the Board's remedial authority—that were never presented to the Board.  The Court lacks jurisdiction to entertain these belated arguments pursuant to the strict jurisdictional bar in Section 10(e) of the Act.  29 U.S.C. § 160(e).

As to the three unfair-labor-practice findings Starbucks disputes on review—a discriminatory reduction in hours and the discriminatory discharges—it does not contest the Board's critical finding that animus toward the employees' protected activities was a motivating factor in its managers' decisionmaking.  Starbucks instead argues that it met its defense burden of proving it would have taken the same actions even in the absence of the employees' protected activities.  But the record evidence fully supports the Board's contrary findings as to each violation.

Starbucks fares no better in attempting to show the Board abused its broad remedial discretion.  The Board's Order requires Starbucks to restore the status quo ante by offering Nowakowska and Bussiere reinstatement and by making them whole for any direct or foreseeable pecuniary harms suffered as a result of the unfair labor practices.  Starbucks's claim that reinstatement is inappropriate due to after-acquired evidence of supposed misconduct fails for two reasons:  Starbucks was aware of the disputed conduct long before the unlawful discharges, and the disputed conduct was itself protected by the Act.  Starbucks separately seizes on the Board's standard make-whole remedy—which the Board recently modified to ensure employees are made fully whole in all cases—to launch a sweeping facial attack on the Board's authority to order any make-whole relief other than backpay.  But Starbucks's arguments reflect a fundamental misunderstanding of the Board's remedial authority and are directly refuted by decades of binding precedent.

10

**STANDARD OF REVIEW**

The Court's review of the Board's unfair-labor-practice findings is limited to determining whether they are supported by "substantial evidence on the record as a whole." *Hedstrom Co. v. NLRB*, 629 F.2d 305, 313-14 (3d Cir. 1980) (en banc). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The Court reviews the Board's remedies for an abuse of discretion. *Kenrich Petrochemicals, Inc. v. NLRB*, 907 F.2d 400, 405 (3d Cir. 1990) (en banc). It will uphold a Board remedy unless shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.*

**ARGUMENT**

I.  **The Court Lacks Jurisdiction To Entertain Starbucks's Challenge to the Removability of the Board's Administrative Law Judges**

Starbucks begins its brief by asking the Court to vacate the Board's Order based on an argument that the administrative law judge who oversaw the hearing was "unconstitutionally insulated from presidential accountability." (Br.23.) Starbucks takes issue with the fact that the Board's judges may only be removed from office by the Board for good cause, subject to review by the Merit Systems Protection Board. (Br.23-27.) However, the Court lacks both jurisdiction and cause to reach Starbucks's argument, which is meritless in any event.

11

A.  **The Act Contains a Strict Jurisdictional Bar Precluding the Court From Entertaining Starbucks's New Argument**

Section 10(e) of the Act dictates that "[n]o objection that has not been urged before the Board … shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e).  Section 10(e) constitutes a jurisdictional bar that precludes the Court from considering new arguments raised on review "[e]xcept in the rare case that presents extraordinary circumstances." *Somerset Valley Rehab. & Nursing Ctr. v. NLRB*, 825 F.3d 128, 138-39 (3d Cir. 2016).

Starbucks concedes that it chose not to raise a challenge to the Board's administrative law judges at any point in the Board proceedings.  (Br.27.)  Given the jurisdictional hurdle therefore posed by Section 10(e), Starbucks halfheartedly argues there should be a categorical exception for "structural separation-of-powers challenges."  (Br.27-28.)  However, Starbucks misconstrues the cases that it cites.

In *Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592 (3d Cir. 2016), this Court was presented with a "rare and remarkable" situation in which the Supreme Court had ruled that a majority of the Board's own members had been unconstitutionally appointed by the President.  *Id.* at 596.  This Court therefore found "extraordinary circumstances" permitting a challenge to actions taken by the Board at a time when *the Board's own composition* was invalid.  *Id.* at 597-600. The Court subsequently clarified the narrowness of its ruling by distinguishing

12

*Advanced Disposal* and holding that it lacked jurisdiction to entertain an untimely challenge to the President's designation of the Board's Acting General Counsel. *Somerset*, 825 F.3d at 139-43 & n.10.  Even though the issuance of an unfair-labor-practice complaint by a validly serving General Counsel is a necessary predicate for the Board to act, the Court found no basis for evading Section 10(e)'s jurisdictional bar.  *Id.*  The Court explained that *Advanced Disposal* turned on the fact that the composition of the Board itself was at issue.  *Id.* at 143 n.10.

The present case is even further removed from *Advanced Disposal*.  A hypothetical defect in the removability of the administrative law judge in this case would have no bearing on the Board's own power to act.  Had Starbucks raised its present argument to the Board, the Board could have exercised its power to vacate the judge's decision and hold a new evidentiary hearing itself.  29 U.S.C. § 160(c).  And unlike an appointment defect, improper removal restrictions would not necessarily implicate the judge's own power to act, much less the Board's.  *See infra* pp.15-16.  It is well established that parties must raise challenges to an administrative law judge's involvement to the reviewing agency in the first instance.  *E.g.*, *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 35-38 (1952); *Smith v. Bd. of Governors*, 73 F.4th 815, 822-24 (10th Cir. 2023); *David Stanley Consultants v. OWCP*, 800 F. App'x 123, 127-28 (3d Cir. 2020).

Starbucks's policy argument that requiring conformance to the jurisdictional limits set by Congress would be "inappropriate" when the Board's expertise is not implicated (Br.27-28 & n.2) is unavailing.  The Supreme Court and lower courts have consistently recognized that Section 10(e) applies with equal force when a party attempts to raise new constitutional arguments or other issues not requiring an interpretation of the Act.  *See, e.g.*, *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896 n.7 (1984) (First Amendment claim); *ILGWU v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3 (1975) (due process claim); *Somerset*, 825 F.3d at 143 (Federal Vacancies Reform Act claim).  As this Court explained in *Somerset*, a court's jurisdiction to consider new arguments in a Board enforcement proceeding must be evaluated based on the existence of "extraordinary circumstances," rather than "some non-statutory ground to excuse a failure to exhaust."  825 F.3d at 142.

The cases cited by Starbucks (Br.28) address inapposite inquiries.  In *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), the Supreme Court evaluated whether collateral review of an agency proceeding was available in district court. In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Court addressed whether to apply a pragmatic, non-statutory exhaustion bar in the context of non-adversarial Social Security proceedings.  Neither inquiry is relevant here.  *See Smith*, 73 F.4th at 822-24 & n.9 (distinguishing *Axon* and *Carr*).  Section 10(e) reflects a congressional

14

intent to confine judicial review of the Board's unfair-labor-practice orders to defenses and arguments actually presented to the Board.

### B. The Court Need Not Decide the Constitutional Question Given That Starbucks Suffered No Harm

Even if the Court had jurisdiction to entertain the issue, it should decline Starbuck's invitation to burden this proceeding with an unnecessary constitutional inquiry for a second reason: Starbucks has shown no harm arising from any purported constitutional defect.

In *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021), the Supreme Court clarified that, unlike constitutional defects in an officer's appointment, improper restrictions on an officer's removability do not render the officer's actions void or necessarily warrant vacatur of those actions. An unlawful removal restriction "does not strip [the officer] of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23. To justify vacatur, a party must affirmatively show "the unconstitutional removal provision inflicted harm." *Id.* at 1789. The Court indicated this showing would likely only be met in rare cases, such as where the President had unsuccessfully sought to remove an officer. *Id.*

The courts of appeals have therefore "followed the Supreme Court's guidance and denied relief on removal claims where the challengers have not shown that the constitutional violation caused them harm." *K&R Contractors LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) (collecting cases). More specifically,

to justify setting aside an agency action, "a party must show that the agency action would not have been taken *but for* the President's inability to remove [the relevant officer]." *CFPB v. Law Offices of Crystal Moroney PC*, 63 F.4th 174, 179-81 (2d Cir. 2023), *petition for cert. filed*, No. 22-1233 (June 21, 2023); *accord Collins v. Dep't of Treasury*, 83 F.4th 970, 982-83 (5th Cir. 2023).  Courts have repeatedly found that this test would not be met in the context of challenges to administrative law judges' removal protections.  *E.g.*, *K&R Contractors*, 86 F.4th at 149; *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1136-38 (9th Cir. 2021).

Starbucks attempts to circumvent this growing consensus with a single conclusory sentence asserting that "[e]xtra accountability" might have prompted the judge here to "look more carefully" at its legal defenses.  (Br.29.)  Such assertion is inadequate.  Not only would it swallow the rule announced by the Supreme Court in *Collins*, but Starbucks ignores the fact that the Board itself carefully reviewed the judge's disputed rulings, findings, and conclusions.  (JA.7.)  The present case is before the Court on the limited question of whether to grant or deny enforcement of *the Board's* Order, not the judge's recommended decision.

Starbucks's claim that it might face further compliance proceedings before one of the Board's judges (Br.28) likewise fails to justify a declaratory judgment regarding the validity of the judges' removal protections.  Even assuming the Court had jurisdiction to grant Starbucks "prospective relief" (Br.28) in the context of an

16

enforcement proceeding, *but see* 29 U.S.C. § 160(e), (f), the requisite showing of harm "remains the same whether the petitioner seeks retrospective or prospective relief." *Law Offices of Crystal Moroney*, 63 F.4th at 180-81; *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022), *rev'd per curiam on other grounds*, 143 S. Ct. 1317 (2023).  Starbucks's claim is also speculative and premature.  Many Board cases settle at the compliance stage without the need for an evidentiary hearing.

### C.     The Board's Administrative Law Judges Are Properly Subject to Removal Protections Granting Them Adjudicative Independence

In any event, even if the Court had jurisdiction and cause to resolve the issue, Starbucks's position is meritless.  Starbucks's arguments—relying in large part on the Fifth Circuit's flawed decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023)—are premised on an untenable overreading of *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), as having established a categorical rule that Congress may never grant inferior officers more than one layer of removal protection.

In *Free Enterprise Fund*, the Supreme Court held that the members of a newly established oversight board appointed by the Securities and Exchange Commission and granted "expansive powers to govern an entire industry" were unconstitutionally insulated from the President's control.  561 U.S. at 484-86.  The Court emphasized the "highly unusual" structure of the board:  its members were only subject to removal by the commission pursuant to a "sharply circumscribed

definition of what constitutes 'good cause,'" but they also served as "the primary law enforcement authority for a vital sector of our economy." *Id.* at 502-08.

The Court stressed that the oversight board's "novel" structure was virtually unprecedented. *Free Enter. Fund*, 561 U.S. at 505-06.  The Court expressly noted that it was *not* making "general pronouncements" that might undermine established features of the federal government, and that its reasoning did *not* extend to the "subset of independent agency employees who serve as administrative law judges," given that many such judges "perform adjudicative rather than enforcement or policymaking functions … or possess purely recommendary powers." *Id.* at 506-07 & n.10; *accord Free Enter. Fund v. PCAOB*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).  It is thus unsurprising that, with the exception of the Fifth Circuit's radical break from the status quo in *Jarkesy*, each court to have considered the issue has rejected challenges to administrative law judges' removal protections. *Calcutt*, 37 F.4th at 314-17; *Decker Coal*, 8 F.4th at 1129-36.

Contrary to Starbucks, the reasoning of *Free Enterprise Fund* is inapplicable to the Board's judges for at least three reasons:

First, the Board's judges exclusively perform "adjudicative rather than enforcement or policymaking functions." 561 U.S. at 507 n.10.  Unlike the oversight board at issue in *Free Enterprise Fund*, the Board's judges cannot initiate investigations or enforcement proceedings.  The Board's General Counsel, who is

appointed by and removable at will by the President, possesses unreviewable final authority to issue unfair-labor-practice complaints alleging violations of the Act. 29 U.S.C. § 153(d); *NLRB v. UFCW, Local 23*, 484 U.S. 112, 124-30 (1987).  Nor can a judge bind the Board or set agency policy.  *See Hedstrom*, 629 F.2d at 315-16.  The Board's judges play a limited role in the statutory scheme by overseeing evidentiary hearings and making recommendations to the Board in the context of individual adjudications.  29 U.S.C. § 160(c).  It is settled law that the Constitution affords Congress greater leeway in granting removal protections to adjudicators.  *Wiener v. United States*, 357 U.S. 349, 355-56 (1958); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935); *see Collins*, 141 S. Ct. at 1783 n.18.

Second, the Board itself, on behalf of the President, possesses adequate alternative means of controlling its judges.  Removal is not an end in itself, but one specific "tool of supervision" that can enable the President or his chosen officers to take care that the laws are faithfully executed.  *Free Enter. Fund*, 561 U.S. at 499. The Board exercises myriad forms of control over its judges.  For example, it need not assign a given case to a judge, but instead is empowered to preside over a hearing itself.  29 U.S.C. § 160(c).  If a case is assigned to a judge, the judge issues a "recommended order" that the Board is statutorily obligated to review upon the filing of valid exceptions.  *Id.*  The Board may reverse a finding made by the judge even if no party has filed a relevant exception.  *Hedstrom*, 629 F.2d at 315-16.

19

Such review extends to any rulings made by the judge—including the ministerial rulings identified by Starbucks (Br.25), 29 C.F.R. § 102.26—and the Board may withdraw such functions from its judges or modify its regulations, 29 U.S.C. § 156.

Third, the actual removal protections at issue in *Free Enterprise Fund* were far more restrictive than those enjoyed by the Board's judges.  Unlike the uniquely heightened removal standard afforded to the oversight board in that case, 561 U.S. at 486, the Board's judges are subject to removal under the familiar "good cause" standard established in the Civil Service Reform Act of 1978, 5 U.S.C. § 7521(a). A reasonable reading of Section 7521 would permit the Board to remove a judge when necessary to ensure the law and Board policy are followed.  *See* Brief for Petitioner, *SEC v. Jarkesy*, No. 22-859 (U.S. Aug. 28, 2023), 2023 WL 5655520, at *59-61.  The fact that members of the Merit Systems Protection Board are in turn subject to removal protections (Br.26-27) does not change the analysis:  their role is limited to adjudicating whether an agency has shown "good cause," rather than interfering with agency policymaking, and they no more create an impermissible layer of removal protection than Article III judges do when reviewing any statutory removal protection.  *See Morrison v. Olson*, 487 U.S. 654, 693 n.33 (1988).

**II.     The Board Is Entitled to Summary Enforcement of Its Order as to Its Uncontested Unfair-Labor-Practice Findings**

The Board found that Starbucks committed fifteen unfair labor practices, only three of which Starbucks contests on review.  Starbucks implicitly concedes or has waived any objection to the remaining unfair-labor-practice findings, and the Board is thus entitled to summary enforcement of the corresponding portions of its Order.  *Arbah Hotel Corp. v. NLRB*, 845 F. App'x 181, 186 (3d Cir. 2021).

In particular, the Board found that Starbucks unlawfully:  threatened Nowakowska and Bussiere in July and November for engaging in protected activities (JA.27-28); instructed Bussiere in November and February not to complain about managers or to have negative conversations with coworkers (JA.28-30); surveilled Bussiere's conversations with coworkers and interrogated employees about Bussiere (JA.29); denied Bussiere work opportunities in October in retaliation for his protected activities (JA.10, JA.31-32); issued Nowakowska discriminatory disciplinary warnings in October and December in retaliation for her protected activities (JA.10, JA.32-34); and issued Bussiere discriminatory disciplinary warnings in November and February in retaliation for his protected activities (JA.10, JA.33, JA.35).

Even though Starbucks has waived any challenge to the foregoing unfair labor practices, the Board's uncontested findings "remain in the case" and provide important context for its contested findings.  *E.C. Waste, Inc. v. NLRB*, 359 F.3d

21

36, 41 (1st Cir. 2004); *see U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314-16

(7th Cir. 1991) (en banc).  That is particularly relevant here, where Starbucks

concedes it repeatedly engaged in coercive and discriminatory conduct targeting

Nowakowska and Bussiere, but denies their subsequent discharges were unlawful.

### III.    Substantial Evidence Supports the Board's Findings That Starbucks Violated Section 8(a)(3) and (1) of the Act by Retaliating Against and Discriminatorily Discharging Nowakowska and Bussiere

Section 7 of the Act guarantees employees the right "to form, join, or assist

labor organizations … and to engage in other concerted activities for … mutual aid

or protection."  29 U.S.C. § 157.  Section 8(a)(3) prohibits employers from

discriminating against employees to discourage unionization, and Section 8(a)(1)

prohibits employers from interfering with employees' Section 7 rights.  29 U.S.C.

§ 158(a)(3), (1).  Employers therefore violate Section 8(a)(3) and (1) by retaliating

against employees for their protected union and/or protected concerted activities.

*Somerset*, 825 F.3d at 145; *Rood Trucking Co.*, 342 NLRB 895, 898 (2004).

When an employer's motive for discharging or taking other actions against

an employee is in dispute, the Board applies its well-established *Wright Line*

framework.  *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 813 (3d Cir. 1986)

(citing *Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d

899 (1st Cir. 1981)); *see NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400-04

(1983).  Pursuant to *Wright Line*, a violation is established if the Board finds an

employee's protected conduct was at least *a* motivating factor in the employer's decision. *Transp. Mgmt.*, 462 U.S. at 400-01; *Somerset*, 825 F.3d at 145-46. The Board may rely on direct or circumstantial evidence to infer an unlawful motive. *NLRB v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 122 (3d Cir. 1991).

Once the Board finds that an unlawful motive contributed to the decision to take an action against an employee, the employer may only avoid an unfair-labor-practice finding by proving, as an affirmative defense, that it would have taken the same action even in the absence of the employee's protected conduct. *Transp. Mgmt.*, 462 U.S. at 401-02; *Hunter Douglas*, 804 F.2d at 815-16. To satisfy this burden, an employer may not simply come up with a post hoc rationalization for its actions or show that a valid basis for discipline existed. *Somerset Valley Rehab. & Nursing Ctr.*, 358 NLRB 1361, 1387 (2012), *readopted*, 362 NLRB 961 (2015), *enforced*, 825 F.3d 128 (3d Cir. 2016). The employer must prove that it *would have* taken the same action even in the absence of the employee's protected conduct, not merely that it *could have* done so. *Somerset*, 358 NLRB at 1361.

Applying *Wright Line* here, the Board found Starbucks committed eight violations of Section 8(a)(3) and (1) by retaliating against Nowakowska and Bussiere for their protected activities. (JA.9-10, JA.30-36.) Starbucks challenges just three of these findings on review, including the unlawful discharges of both employees. (Br.30-42.)

Starbucks does not dispute that Nowakowska and Bussiere engaged in extensive protected activities over a period of several months.  (JA.10 n.15, JA.31.) These protected activities were often highly public and well known to Starbucks. (JA.31.)  Starbucks likewise does not dispute that it harbored considerable animus toward Nowakowska and Bussiere's protected activities.  (JA.31-36.)  Indeed, Starbucks could hardly argue otherwise while conceding that its managers committed thirteen unfair labor practices targeting Nowakowska and Bussiere. *U.S. Marine*, 944 F.2d at 1316 (finding animus based on uncontested violations).

Accordingly, pursuant to *Wright Line*, Starbucks effectively concedes on review that substantial evidence supports the Board's findings that Nowakowska and Bussiere's protected activities were a motivating factor in the actions taken against them.  (JA.31-36.)  *Somerset*, 358 NLRB at 1387.  For the three contested violations, Starbucks argues only that it met its *Wright Line* defense burden of proving it would have taken the same actions even in the absence of the employees' protected activities.  As shown below, Starbucks's arguments fail.

### A.    Starbucks Unlawfully Reduced Nowakowska's Scheduled Hours

Substantial evidence supports the Board's finding that Starbucks violated Section 8(a)(3) and (1) when it reduced Nowakowska's hours between November 18 and December 22 in response to her protected activities.  (JA.21, JA.32-33.)

After Starbucks implemented an overall reduction in hours at the Broad &

Washington store in October, store manager David Vaughan continued to schedule Nowakowska for nearly 30 hours per week through mid-November. (JA.21; JA.647-64.) Starting the week of November 18, however, Vaughan drastically cut Nowakowska's hours and began scheduling her for a mere 19 hours per week. (JA.21; JA.665-70.) The reduction in hours came shortly after Starbucks managers discussed the need to "move with urgency" at the store to head off an anticipated increase in employee protests. (JA.806.) Most employees saw little to no reduction in their scheduled hours at the store, and at least two employees saw an increase in hours over the same timeframe. (JA.21 n.18.)

Significantly, when Nowakowska spoke to Vaughan about her sudden reduction in scheduled hours, he informed her that he would not schedule her if she was going to continue to cause a "disruption." (JA.21; JA.239-40.) As the Board found, Vaughan's statement would have been reasonably construed as an allusion to Nowakowska's protected activities, and it was therefore a separate, uncontested unfair labor practice. (JA.28.) Vaughan also referenced the October disciplinary warning issued to Nowakowska, which Starbucks concedes was a discriminatorily motivated response to her protected activities. (JA.32-33.) The evidence thus fully supports the Board's finding that Vaughan's decision to reduce Nowakowska's scheduled hours was also discriminatorily motivated by her protected activities. (JA.33.) *Jolie Belts Co.*, 265 NLRB 1130, 1130 (1982).

On review, Starbucks notes that there was an "across-the-board staffing cut" starting in October and that other employees also experienced reductions in hours. (Br.40-41.)  But the Board did not rely on a contrary premise.  Having found that unlawful animus contributed to Vaughan's decision to schedule Nowakowska for fewer hours than he otherwise would have—and in the context of Starbucks having the burden to establish a *Wright Line* defense—the Board observed that Starbucks was unable to explain why Nowakowska in particular experienced one of the largest reductions in scheduled hours starting in mid-November.  (JA.33.)

Starbucks's suggestion that Nowakowska's total hours were similar to other employees (Br.41) is misleading.  Starbucks cites a spreadsheet listing total hours worked at all stores, which does not reflect the number of scheduled hours given by Vaughan for the Broad & Washington store.  (*See* JA.17 n.6, JA.21 n.20; *cf.* JA.647-70.)  Starbucks also claims the Board erred in finding employees Sham and Siburt received increased hours.  (Br.42.)  But both employees saw a marked and unexplained increase in scheduled hours starting in mid-November—not counting the two weeks Shams took off, and irrespective of the fact Siburt occasionally worked evening shifts, as she had all along.  (JA.647-70.)  Starbucks failed to carry its *Wright Line* defense burden.  (JA.33.)

### B.    Starbucks Unlawfully Discharged Nowakowska

Substantial evidence also supports the Board's finding that Starbucks

violated Section 8(a)(3) and (1) by subsequently discharging Nowakowska in

retaliation for her protected activities.  (JA.10, JA.34-35.)

Despite being subjected to two undisputedly unlawful disciplinary warnings

and a discriminatory reduction in hours, Nowakowska continued to advocate on

behalf of coworkers and to engage in protected activities on a day-to-day basis.

(JA.10 & n.15, JA.32-34.)  On January 18, for example, Nowakowska and

Bussiere engaged in protected activity by attempting to assist a coworker facing

discharge.  (JA.10 n.15, JA.24, JA.31.)  The following week, Vaughan sent district

manager Brian Dragone an email "venting" about Nowakowska and Bussiere,

referencing their recent protected conduct, and stating he was "willing to deal with

the backlash that would come with terminating the two of them."  (JA.34; JA.819)

Just one day after Vaughan's email, Starbucks abruptly discharged

Nowakowska for allegedly treating customers in a "hostile manner" during two

incidents on January 16 and January 22.  (JA.25; JA.1436.)  As the Board found,

the incidents in question were far more tame than alleged by Starbucks and

involved, at most, Nowakowska making a single intemperate comment.  (JA.25-26,

JA.35.)  The Board found considerable evidence that Nowakowska's discharge

was motivated by animus, including:  (i) Vaughan's email one day prior;

(ii) Starbucks's failure to conduct a normal investigation or to ask Nowakowska her version of events; and (iii) Starbucks's disparate treatment of Nowakowska as compared to other employees given lesser discipline for worse misconduct. (JA.34-35.)  *Somerset*, 825 F.3d at 146 (noting timing, departure from normal practices, and disparate treatment all suggest animus).

On review, Starbucks solely argues that the Board improperly rejected its *Wright Line* defense.  (Br.31-36.)  First, Starbucks wrongly asserts that "all agree" Nowakowska "blew up" at a customer on January 22.  (Br.3, 9, 32-33.)  But the Board credited Nowakowska's testimony that she merely commented, "Now you want free butter?" while she rang up the customer's order and while shift supervisor Leanne Bissell retrieved the requested butter.  (JA.25; JA.279.) Although inconsistent with ideal customer service, the incident was a far cry from the "extremely hostile" behavior Starbucks alleged in the termination notice (JA.1436), and Starbucks failed to prove its managers would have reacted as harshly to such an incident absent animus.  (JA.34-35.)  Tellingly, on review Starbucks has abandoned any reliance on the other alleged incident cited in the termination notice as grounds for Nowakowska's discharge.

Second, Starbucks argues its managers could have instead chosen to discharge Nowakowska for a supposed pattern of "other infractions."  (Br.32-35.) But the minor allegations cited by Starbucks—that Nowakowska once raised her

voice in the store and that she failed to provide "excellent" customer service on two occasions (Br.33-34)—are derived from two prior warnings that are each the subject of *uncontested unfair-labor-practice findings*.  (JA.32-34 & n.46.)  The Board found the cited incidents were seized upon at the time as pretextual excuses to issue Nowakowska coercive disciplinary actions in retaliation for her protected activities, and Starbucks has waived any challenge to those findings.  (JA.32-34.)  As the Board explained, an employer may not rely on prior unlawful disciplinary actions to defend against a finding that its later discharge of the same employee was unlawful.  (JA.33-34.)  *Celotex Corp.*, 259 NLRB 1186, 1186 n.2 (1982).

Moreover, even if Starbucks were not precluded from relying on the prior unlawful warnings, and even crediting its questionable version of the facts, its argument would still fail under *Wright Line*.  Starbucks's defense burden was to prove that it *would have* discharged Nowakowska, not merely that it could have done so.  *Somerset*, 358 NLRB at 1361.  The Board described in detail significant evidence of disparate treatment, including employees who engaged in poor customer service *and* who had far more extensive track records of misconduct without being discharged.  (JA.32, JA.34-35; *e.g.*, JA.708-10.)

### C.     Starbucks Unlawfully Discharged Bussiere

Substantial evidence likewise supports the Board's finding that Starbucks violated Section 8(a)(3) and (1) by discriminatorily discharging Bussiere on pretextual grounds in retaliation for his protected activities.  (JA.10, JA.34-35.)

Shortly after Nowakowska's unlawful discharge, Vaughan issued Bussiere a warning based on the unsupported allegation that Bussiere attempted to enter a back room during a coworker's disciplinary meeting.  Starbucks does not contest the Board's findings that Vaughan had reason to doubt the alleged infraction occurred, and that the pretextual warning was an unfair labor practice designed to coerce Bussiere.  (JA.35.)  Bussiere nonetheless continued to exercise his statutory rights.  On February 17, for example, shift supervisor Bissell overheard Bussiere answering a coworker's questions about previous in-store demonstrations and a pending lawsuit against Starbucks in the Philadelphia area.  (JA.26.)  Bissell immediately texted Vaughan asking what to do about Bussiere's "negative" conversation, which led to two more uncontested unfair labor practices when Bissell and Vaughan separately instructed Bussiere not to speak "negatively" or to discuss "drama" about Starbucks.  (JA.26, JA.29-30.)

On February 19, Dragone and Vaughan learned that Bussiere had recently attempted to assist a coworker by relaying a rumor that the coworker might be facing discharge.  (JA.27.)  On February 26, Starbucks discharged Bussiere on the

grounds that he had "knowingly communicat[ed] false information" to the coworker. (JA.34-35; JA.1456.) But as the Board found, Starbucks was unable to explain the basis for its key assertion that Bussiere acted maliciously by conveying a rumor he "knew" to be false. (JA.36.) Furthermore, the termination notice referenced the November warning previously issued to Bussiere for "disrupting" coworkers. (JA.36; JA.1456.) Starbucks does not contest that the November warning was an unfair labor practice aimed at pressuring Bussiere into ceasing statutorily protected activities that some coworkers found objectionable. (JA.22, 28, 33.) The Board reasonably found that the stated justification for Bussiere's discharge was therefore mere pretext—"that is, either false or not in fact relied upon," *Rood Trucking*, 342 NLRB at 898—and that Starbucks's real motive was animus toward Bussiere's continuing protected activities. (JA.10, JA.35-36.)

On review, Starbucks nonetheless argues the Board erred in rejecting its *Wright Line* defense. (Br.36-39.) However, Starbucks's position is foreclosed as a matter of law by its failure to dispute the Board's dispositive finding that the stated justification for Bussiere's discharge—that he knowingly conveyed a false rumor—was mere pretext. Where an employer's stated reasons for discharging an employee are pretextual, the employer "fails by definition" to satisfy its *Wright Line* burden. *Rood Trucking*, 342 NLRB at 898. Even assuming Bussiere had a "history" of infractions, as Starbucks alleges (Br.38-39), that would not explain

31

why Starbucks chose to discharge him on February 26 insofar as the triggering incident was mere pretext. *Cf. Local 277, Int'l Bhd. of Painters v. NLRB*, 717 F.2d 805, 812 (3d Cir. 1983) (inferring unlawful motive where union waited to invoke alleged competency issues until employee "became a thorn in its side").

Starbucks now attempts to change tack on review by claiming that the reference in Bussiere's termination notice to his previous discipline for "disrupting operations and [coworkers]" (JA.1456) constituted an independent ground for termination implicitly encompassing every prior infraction Bussiere had ever committed. (Br.37.) But at the time of the discharge Starbucks's managers cited none of the allegations or minor infractions that Starbucks now invokes. Nor did Starbucks cite them to the Board as part of its *Wright Line* defense. Instead, as the Board found, and as Starbucks did not dispute, the termination notice refers to the unlawful November warning and similar statements made to Bussiere directing him to cease distracting coworkers by being "negative" or by complaining about Vaughan. (JA.27-28, 33, 36.) The Court lacks jurisdiction to entertain Starbucks's new rationale for the decision to discharge Bussiere. 29 U.S.C. § 160(e).

In any event, Starbucks's attempt to cobble together a pattern of terminable misconduct is unavailing. The allegations that Bussiere occasionally forgot to wear his hat and once forgot to stock the pastry case are derived from the unlawful November warning, which the Board found would not have issued absent animus

toward Bussiere's protected activities. (JA.21-22, JA.33, JA.36.) The incident in which Bussiere agreed to cover two shifts at once was addressed in a December meeting at which his managers declined to issue any corrective action. (JA.24.) The allegation that Bussiere was rude to his shift supervisor—raised to Dragone as part of an email expressing overt animus toward Bussiere's protected activities (JA.1677)—similarly resulted in no corrective action. (JA.27 n.30.)

Meanwhile, the uninvestigated claim that Bussiere was having a negative impact on "morale"—submitted by a coworker the Board discredited and found to have a personal bias against Bussiere (JA.25 n.29)—is merely duplicative of the Starbucks's unlawful position that Bussiere was disrupting coworkers by engaging in protected activities that some employees subjectively opposed or found annoying. (JA.28-30, JA.33.) The only evidence of actual misconduct Starbucks deemed worthy of corrective action are two attendance infractions that occurred months earlier (JA.21)—hardly the requisite proof Starbucks had the burden to produce under *Wright Line* to show it would have discharged Bussiere in February absent animus toward his protected activities. *Somerset*, 358 NLRB at 1361.

## IV. The Board Did Not Abuse Its Discretion by Ordering Starbucks To Offer Nowakowska and Bussiere Reinstatement

As the conventional remedy for an unlawful discharge, reinstatement is an important means of effectuating the policies of the Act by returning discriminatees to the workplace. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 182-89 (1941). An

employer may nonetheless show that reinstatement is inappropriate in a given case based on after-acquired evidence of disqualifying misconduct, but the employer has the burden to prove:  the misconduct occurred; the employer was unaware of the misconduct prior to the discharge; and the misconduct would have disqualified the employee from continued employment.  *Somerset*, 362 NLRB at 962.  This is a "demanding" standard, and any ambiguities must be resolved against the employer. *Id.*  Even beyond the ordinary abuse-of-discretion standard of review applicable to the Board's choice of remedies, the Court is "particularly hesitant" to set aside a Board order requiring reinstatement.  *Somerset*, 825 F.3d at 147.

During the Board proceedings, Starbucks claimed to have learned for the first time that Nowakowska and Bussiere had recorded conversations inside the Broad & Washington store.  (JA.10.)  Nowakowska testified that she used her phone to record meetings with Vaughan and other managers on four occasions between July and October.  (JA.11, JA.36-37; JA.294.)  It is undisputed that she did so to preserve a neutral documentation of what was said because she feared— correctly, as it turned out—that Starbucks was planning to retaliate against her for her protected activities.  (JA.12; JA.294-95.)  Bussiere testified that he also recorded certain meetings with managers out of a well-founded fear of possible retaliation, and that he began regularly recording his shifts with Vaughan after an incident in which Vaughan falsely accused him of misconduct.  (JA.37; JA.320,

JA.353-54.)  As shown below, Starbucks failed to establish the recordings would justify denying Nowakowska and Bussiere reinstatement or cutting off the backpay owed to them as of the date they testified about their recordings.

### A. Starbucks Was Already Aware That Nowakowska and Bussiere Were Recording Conversations Prior to Discharging Them

The Board first found the challenge to the reinstatement remedy must fail because the evidence indicates Starbucks's managers were already aware Nowakowska and Bussiere were recording conversations inside the store months prior to discharging them on different, pretextual grounds.  (JA.10-11, JA.36-38, JA.43-44.)  At a minimum, Starbucks failed to carry *its* burden of proving it was *unaware* of alleged misconduct so egregious as to preclude continued employment, particularly given that any ambiguities must be resolved against it as the wrongdoer seeking to deny employees reinstatement.  *Somerset*, 362 NLRB at 962.

Within weeks of taking over as store manager, Vaughan witnessed both Nowakowska and Bussiere attempt to record him.  (JA.37; JA.434-35.)  This is confirmed in an October report sent to upper management by Dragone noting that Bussiere "was attempting to record, via phone, conversations [with Vaughan]." (JA.11; JA.827.)  Dragone testified that Vaughan informed him Bussiere "was recording any conversations they were having."  (JA.11; JA.516.)  Operations coach Melissa Maimon separately reported to upper management in late October that employees were "videoing conversations between [Vaughan] and themselves,"

which prompted Dragone to coach Vaughan on "not allowing [employees] to video their conversations with him." (JA.11; JA.806-07.) In mid-November, Bussiere *sent* Vaughan timestamped, verbatim "transcripts" of recordings he had made in the store—which showed Bussiere had incidentally captured customer voices. (JA.37-38; *e.g.*, JA.687.) No follow-up investigations occurred, and none of Starbucks's internal communications indicate it viewed the recording activity as a serious infraction precluding continued employment.

On review, Starbucks fails to rebut the Board's reasonable reading of the evidence and misconstrues the controlling legal standard. (Br.44-46.) Starbucks simply ignores most of the foregoing evidence that its managers knew recording was taking place. And Starbucks's suggestions that it merely knew Nowakowska and Bussiere were "attempting" to record conversations or that it "suspected" them of recording conversations (Br.45) fails to explain why it took no further action at the time. As the Board found, Starbucks's admitted *belief* that recording was taking place, unaccompanied by any investigation or further action at the time, effectively forecloses any subsequent argument that the recordings constituted misconduct so egregious as to preclude further employment. (JA.44.)

**B.**     **Nowakowska and Bussiere's Recording Activities Were Protected by the Act and Could Not Serve as a Valid Basis for Discharge**

The Board also found that Starbuck's challenge to the reinstatement remedy must fail for the independent reason that Nowakowska and Bussiere were engaged in conduct protected by Section 7 of the Act.  (JA.11-12.)

The Board has repeatedly found that employees may be engaged in protected conduct when making audio or visual recordings in the workplace, such as when documenting certain discussions about terms and conditions of employment, or "recording evidence to preserve it for later use in administrative or judicial forums in employment-related actions."  *Whole Foods Mkt., Inc.*, 363 NLRB 800, 802 (2015) (citing examples), *enforced*, 691 F. App'x 49 (2d Cir. 2017).  Here, it is undisputed Nowakowska and Bussiere sought to document their interactions with managers based on a well-founded concern that they might face retaliation for their ongoing protected activities, and to preserve evidence for potential Board proceedings.  Since the Board reasonably found that the recordings were protected by the Act in these circumstances, Starbucks is precluded from arguing it would have lawfully discharged either employee based on such recordings.  (JA.12.)

On review, Starbucks now attempts to argue that Bussiere in particular was not engaged in "concerted" activity within the meaning of Section 7—misstating Board law by declaring that an employee must have "coordinated his recordings with other employees" to be protected by the Act.  (Br.48.)  The Court lacks

37

jurisdiction to entertain this argument, however, as Starbucks did not present it to the Board.  29 U.S.C. § 160(e); *Atl. City Elec. Co. v. NLRB*, 5 F.4th 298, 306-07 (3d Cir. 2021).  Starbucks argued to the Board that the employees' recordings lost the protection of the Act—as discussed below—but it never alleged that either employee's recordings were not concerted.

In any event, Starbucks argument is meritless.  Bussiere testified that he discussed his plan to begin recording managers with Nowakowska before doing so for the first time in late July, and his recording activity was thus plainly concerted.  (JA.320, JA.353.)  Even if Bussiere had not discussed his plan with Nowakowska, a lone employee's recording activity remains concerted if it "forms part of, or is undertaken in furtherance of, a course of group action."  *Whole Foods*, 363 NLRB at 802 n.9.  Here, Bussiere's prophylactic recordings were made in furtherance of his broader course of concerted activities and union organizing activities.

Starbucks also argues that the employees' recording activities lost the protection of the Act by contravening Starbucks's supposed "'overriding employer interest' in customer and employee privacy."  (Br.49-50.)  Starbucks's argument is factually and legally unavailing.

As a factual matter, Starbucks overstates the record by asserting Bussiere and Nowakowska engaged in "pervasive recording of fellow [employees] and customers."  (Br.43.)  There is no evidence Nowakowska recorded customers or

non-supervisory coworkers.  Starbucks did not allege before the Board that she did, and it is barred from doing so for the first time on review.  (JA.46 n.8.) 29 U.S.C. § 160(e).  And the record shows Bussiere only inadvertently captured customer orders and "indiscernible" customer chatter while recording portions of his shift at the front counter in proximity to Vaughan.  (JA.1610.)  Bussiere deleted nearly all of his "30-plus recordings" (Br.49) without even listening to them (JA.354).

As a legal matter, Starbucks offers no compelling explanation as to how Nowakowska and Bussiere's otherwise statutorily protected attempts to document their conversations with managers interfered with Starbucks's business operations. (JA.46.)  Starbucks's own employee handbook instructs employees that recording is *permissible* when "protected by federal labor laws." (JA.1328.)  And while Starbucks's claimed business interest in total privacy at its public coffee shop is questionable given that Starbucks itself maintains security cameras that record customers and employees (JA.1328), the Board did not find that Starbucks was barred from maintaining a general no-recording policy (JA.12, JA.46-47).  If Bussiere inadvertently recorded the voices of customers or coworkers at times, it was an unavoidable consequence of exercising his statutory rights in the particular circumstances of his place of work.  (JA.46.)  As the Board reasonably found, any

balancing of Section 7 rights and employer interests in this case "tips sharply in favor of fully remedying [Starbucks's] violations of the Act." (JA.47.)[2]

## V. The Board Did Not Abuse Its Discretion by Ordering Starbucks To Make Nowakowska and Bussiere Whole for All Direct or Foreseeable Pecuniary Harms Suffered as a Result of the Unfair Labor Practices

In *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (2022), *petition for review filed*, 5th Cir. No. 23-60132 (oral argument held Feb. 6, 2024), the Board determined that in order to best effectuate the policies of the Act, it would modify its standard make-whole remedy by incorporating an express requirement that respondents make employees whole for all "direct or foreseeable pecuniary harms" suffered as a result of unfair labor practices. *Id.* at *9-21. The Board explained that standardizing the language of its remedial orders to clarify that make-whole relief includes direct or foreseeable pecuniary harms—rather than remedying such harms on an ad hoc basis, as in the past—was necessary to effectuate the Act's core remedial objectives of making employees whole and restoring the status quo ante. *Id.* at *10-13. Consistent with established Board practice, the existence of pecuniary harms warranting relief, if any, will be determined in a subsequent

---

[2] Starbucks implies in passing that the recordings may have violated Pennsylvania law (Br.43), but Starbucks has waived any such claim on review by failing to support it with developed argumentation. *Zimmermann v. NLRB*, 749 F. App'x 148, 150 (3d Cir. 2019). In any event, the Board fully addressed such claim and Starbucks has again waived any response. (JA.12-13 & n.20, JA.44-47.)

compliance proceeding, as necessary.  *Id.* at *17-21; *see NLRB v. Hudson Transit Lines, Inc.*, 429 F.2d 1223, 1232 & n.14 (3d Cir. 1970).

The Board applied *Thryv* in the present case and ordered Starbucks to make Nowakowska and Bussiere whole for all direct or foreseeable pecuniary harms suffered as a result of the unfair labor practices.  (JA.7 n.3, JA.47.)  If any such harms are ultimately alleged in this case, the Board's General Counsel will have the burden to present evidence in a compliance proceeding proving causation and amount, and Starbucks will have an opportunity to rebut any such allegations. *Thryv*, 2022 WL 17974951, at *19.  On review, Starbucks does not take issue with the Board's reasoning for standardizing the language of its make-whole orders. Starbucks—joined in part by the Chamber of Commerce, et al. ("Amici")—instead seizes upon the Board's now-standard remedial language to launch a sweeping facial attack on the Board's authority to *ever* order *any* form of make-whole relief other than "backpay."  (Br.51-67, Amici Br.4-30.)

Starbucks's and Amici's opportunistic arguments are contrary to decades of well-established precedent and are entirely baseless.  In addition, many of Starbucks's and Amici's arguments—including their constitutional attacks on the scope of the Board's remedial authority, and Starbucks's misguided attempt to impose an inapposite distinction between "legal" and "equitable" remedies—were not raised to the Board and are not properly before the Court.

A.    **The Board's Remedy Effectuates the Policies of the Act and Is Consistent with Decades of Well-Established Precedent**

Section 10(c) of the Act grants the Board "broad discretionary" authority to remedy unfair labor practices by ordering "such affirmative action … as will effectuate the policies of this Act." *Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 215-16 (1964) (citing 29 U.S.C. § 160(c)).  The task of devising unfair-labor-practice remedies rests with the Board, and the Board's remedies must stand unless shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.*; *Kenrich*, 907 F.2d at 405 (en banc).

One of the most fundamental remedial objectives in effectuating the policies of the Act is to "restor[e] the situation, as nearly as possible, to that which would have obtained but for the [unfair labor practice]." *Phelps Dodge*, 313 U.S. at 194. Accordingly, it is well settled that "making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." *NLRB v. Strong*, 393 U.S. 357, 359 (1969); *accord Hedstrom*, 629 F.2d at 317 (en banc); *Atl. Limousine, Inc. v. NLRB*, 243 F.3d 711, 713 (3d Cir. 2001).  Make-whole relief for harms suffered as a result of an unfair labor practice is necessary to undo the consequences of the unlawful conduct, restore the status quo ante, and dissipate the coercive impact on employees. *See Sure-Tan*, 467 U.S. at 900; *Local 60, United Bhd. of Carpenters v. NLRB*, 365 U.S. 651, 655 (1961); *Kenrich*, 907 F.2d at 411.

42

As a result, and contrary to the baseless assertion that the *Thryv* remedy is "unprecedented" (Br.51, Amici Br.24), the Board has ordered make-whole relief for direct or foreseeable pecuniary harms in a wide range of contexts. *Thryv*, 2022 WL 17974951, at *11-13 (citing examples). At times, the Board has ordered make-whole relief for specific pecuniary harms identified at the liability stage. *E.g.*, *Quick v. NLRB*, 245 F.3d 231, 255 (3d Cir. 2001) (legal expenses); *Napleton 1050, Inc.*, 367 NLRB No. 6, 2018 WL 4694098, at *5 (2018) (damaged property), *enforced*, 976 F.3d 30 (D.C. Cir. 2020). At other times, the Board has included such relief at the compliance stage pursuant to general make-whole language in its orders. *E.g.*, *NLRB v. Louton, Inc.*, 822 F.2d 412, 413-14 (3d Cir. 1987) (medical expenses); *Lou's Transp., Inc.*, 366 NLRB No. 140, 2018 WL 3570875, at *1 (2018) (lost investment growth), *enforced*, 945 F.3d 1012 (6th Cir. 2019); *Lee Brass Co.*, 316 NLRB 1122, 1122 n.4, 1128-31 (1995) (medical expenses), *enforced mem.*, 105 F.3d 671 (11th Cir. 1996). The main innovation in *Thryv* was merely to standardize relief for such harms as an express, routine component of the Board's make-whole orders. 2022 WL 17974951, at *10-13.

Starbucks's persistent attempts to reframe the Board's *Thryv* remedy as granting "damages" for private injuries (Br.51-67) are mistaken. While the Board's make-whole orders might sometimes "resemble compensation for private injury," it must "be constantly remembered that [they] are remedies created by

statute … [which] vindicate public, not private rights." *Va. Elec. & Power Co. v.*

*NLRB*, 319 U.S. 533, 543 (1943).  Individual victims of an unfair labor practice

have no private claim guaranteeing them make-whole relief from the Board, and

any make-whole relief awarded at the discretion of the Board "has no private

character whatsoever until it is in the employee's hands." *NLRB v. Stackpole*

*Carbon Co.*, 128 F.2d 188, 192 (3d Cir. 1942); *see, e.g.*, *id.* (no right to assign);

*Amalgamated Utility Workers v. Consol. Edison Co.*, 309 U.S. 261, 265-70 (1940)

(no right to obtain judicial decree).  As the Board noted in *Thryv*, terms of art like

"consequential damages," as used in other areas of the law, are inapt descriptions

of make-whole relief designed to undo the effects of an unfair labor practice and

advance the policies of the Act.  2022 WL 17974951, at *13.[3]

In general, Starbucks's and Amici's arguments reflect a fundamental

misunderstanding of the Board's congressionally prescribed role in effectuating the

policies of the Act.  An employee who suffers unremedied pecuniary harms after

having been unlawfully discriminated against for engaging in protected activity is

---

[3]  Based on the foregoing distinction, the Supreme Court held in *UAW v. Russell*, 356 U.S. 634 (1958), that Section 10(c) was not intended to supplant private tort claims or to confer "exclusive jurisdiction" on the Board as the sole entity tasked with providing "full compensatory damages for [private] injuries." *Id.* at 642-43; *see Shepard v. NLRB*, 459 U.S. 344, 351-52 (1983).  Starbucks overstates dicta from *Russell* (Br.54-55) in which the Court merely observed that the Board did not at that time routinely award medical expenses or other forms of relief available in state court proceedings—including punitive damages, a form of relief indisputably beyond the Board's authority.  356 U.S. at 645-46.

self-evidently less likely to engage in such activity in the future—as are any other employees who witness such harms go unremedied.  The Board acts at the core of its remedial authority in ensuring that employees are made fully whole for unfair labor practices committed against them, thereby restoring the status quo ante and dissipating what this Court has described as the "lingering *in terrorem* effects of unlawful employer conduct."  *Kenrich*, 907 F.2d at 406-07 & n.7.

## B.  Starbucks's Attempts To Redefine the Board's Statutory Remedial Authority Are Baseless and Contrary to Precedent

### 1.  The Act Does Not Limit Make-Whole Relief to Backpay

Many of Starbucks's arguments are implicitly premised on a basic textual error:  the assertion that because Section 10(c) provides the illustrative example of "reinstatement … with or without back pay," the Board's discretionary authority to order "affirmative action … as will effectuate the policies of this Act" must be interpreted as *limited* to reinstatement with or without backpay.  (Br.53-58.)

The Supreme Court decisively rejected this same argument more than eight decades ago, explaining that Congress included reinstatement with or without backpay merely as an "illustrative application" of the Board's "diverse" remedial authority.  *Phelps Dodge*, 313 U.S. at 188-89.  The Court found no basis for attributing "destructive significance" to the inclusion of such illustration and held that Congress "clearly" intended to grant the Board open-ended authority to order "such affirmative action as will effectuate the policies of this Act."  *Id.*; *accord Va.*

*Elec.*, 319 U.S. at 539 ("Within this limit the Board has wide discretion in ordering affirmative action; its power is not limited to the illustrative example of one type of permissible affirmative order, namely, reinstatement with or without back pay.").[4]

As a result, the Court need look no further than the text of Section 10(c) and the decades of binding precedent construing the scope of the Board's remedial authority.  However, Starbucks's and Amici's discussions of the legislative history are also unavailing.  (Br.59, Amici Br.6-18.)  Although the Senate bill underwent several transformations—at times referring to "damages" or "restitution"—the committee notes expressed a preference for the open-ended phrase "effectuate the policies of this Act," and nothing in the legislative history indicates "an intention to narrow the discretion of the Board in remedial matters" through the statute's final wording.  *Unbelievable, Inc.*, 318 NLRB 857, 863 (1995) (reviewing legislative history), *enforcement denied on other grounds*, 118 F.3d 795 (D.C. Cir. 1997); *accord Phelps Dodge*, 313 U.S. at 188-89.  Neither Starbucks nor Amici are able to muster a single statement from an elected representative supporting their claim that the Board's authority to order make-whole relief is limited to backpay.

---

[4]  Contrary to Starbucks (Br.56), nothing in *Thryv* suggests the Board would award non-"back pay" make-whole relief to employees discharged "for cause" within the meaning of Section 10(c)—an issue not presented in this case. *Cf. Transp. Mgmt.*, 462 U.S. at 401 n.6 (construing Section 10(c) proviso as prohibiting any form of "compensat[ion]" for employees discharged solely for legitimate reasons).

Starbucks and Amici therefore attempt to circumvent the text and policies of the Act altogether by insisting the Act is indistinguishable from Title VII, and by citing the Supreme Court's observation in *United States v. Burke*, 504 U.S. 229, 239 (1992), that Title VII did not permit courts to award tort-like "consequential damages." (Br.56-58, Amici Br.19-21.) But even setting aside the fact that the Board is not ordering consequential damages, *supra* pp.43-44, the Act and Title VII are distinct statutory schemes. The remedial authority granted to the Board to effectuate national labor policy is not coterminous with the remedial authority granted to courts in resolving Title VII lawsuits. Because the remedial provision in Title VII as originally enacted in 1964 was modeled in part on Section 10(c) of the Act, the Supreme Court has looked to Board caselaw existing at the time of Title VII's enactment as a guide for determining congressional intent with respect to specific remedies under Title VII. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848-49 (2001) (backpay); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 769-70 (1976) (retroactive seniority); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 n.11 (1975) (backpay). By contrast, Starbucks and Amici do not cite a single case interpreting the meaning of *the Act* based on what another Congress may have intended three decades later when drafting Title VII.

Starbucks and Amici also misdirect the Court regarding the text of Title VII and its evolution over time. (Br.57, Amici Br.19.) Contrary to Starbucks (Br.57),

it was not until 1972 that Congress amended Title VII to insert additional language

directing courts to order affirmative action or "other *equitable relief* as the court

deems appropriate." Pub. L. 92-261, 86 Stat. 103 (1972) (emphasis added). It was

on the basis of this later textual revision that the Supreme Court concluded Title

VII did not permit recovery of certain "legal" damages. *Mertens v. Hewitt Assocs.*,

508 U.S. 248, 255 (1993) (clarifying *Burke*). As discussed below, no similar

limitation appears in the Act.[5]

Moreover, in the narrow context of interpreting federal tax law, the Supreme

Court in *Burke* was distinguishing remedies for "economic" injuries as

contemplated by Title VII from the "broad range of damages" available in tort

actions, which in many cases "are larger than the amount necessary to reimburse

actual monetary loss sustained." 504 U.S. at 235-39. By contrast, the Board's

*Thryv* remedy addresses pecuniary losses proven to have been incurred as a result

of an unfair labor practice, not reputational harm or other "unquantifiable,

speculative, or nonspecific" injuries. 2022 WL 17974951, at *19.

---

[5] As Starbucks notes, "differences in language … convey differences in meaning." (Br.58.) Starbucks and Amici are not aided by citing various formulations used by Congress in different statutes (Br.58, Amici Br.21-22), given that the open-ended language in Section 10(c) is *broader* than any of the cited statutes, underscoring the remedial flexibility that Congress intended to grant the Board.

## 2.    The Act Does Not Distinguish Between Law and Equity

Starbucks further argues, for the first time, that the Court should read an unprecedented limitation into the Act by confining the Board's remedies to "traditional equity practice."  (Br.51-65.)

The Court lacks jurisdiction to entertain this proposed interpretation of Section 10(c), because Starbucks failed to present it to the Board.  29 U.S.C. § 160(e); *Atl. City Elec.*, 5 F.4th at 306-07.  In its motion for reconsideration attacking the *Thryv* remedy, Starbucks made the narrower argument addressed above:  that the reference to reinstatement "with or without back pay" in Section 10(c) means backpay is the "only recoverable category of damages."  (JA.1981.) Starbucks did not present expansive claims regarding the Board's power to order "legal remedies" (Br.54) or attempt to impose a categorial limitation on Board remedies based on "traditional equity practice" (Br.65)—presumably a reference to those remedies commonly utilized by courts of equity hundreds of years ago. Starbucks's new arguments strike at the heart of the Act and cannot be entertained by the Court when the Board had no opportunity to address them.

In any event, Starbucks's attempt to import a common-law distinction between legal and equitable remedies into Section 10(c) of the Act is baseless. Even in the context of actions in court—versus administrative adjudications—the historical distinction between law and equity from the era of the divided bench has

been recognized as "archaic" and "unworkable" as applied in the modern legal system. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988); *see* Wright & Miller, Federal Practice & Procedure § 1041 (4th ed. 2023). The Supreme Court has only revisited the "obsolete" distinction between legal and equitable remedies when compelled to do so as a matter of textual interpretation. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 216-17 (2002). Thus, for example, the Court has interpreted Congress's deliberate use of the limiting term "equitable relief" as referring to those forms of relief that were traditionally available in equity. *Id.* at 209-10; *Mertens*, 508 U.S. at 255-63. Likewise, the Court considers the distinction when determining whether private rights of action fall within the textual phrase "Suits at common law" in the Seventh Amendment. *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 40-42 & n.4 (1989).

Section 10(c) contains no such textual limitation on the Board's remedial authority. Tellingly, Starbucks does not identify a single case from the nine-decade history of the Act evaluating the scope of the Board's remedial authority based on a common-law distinction between legal and equitable relief. (Br.52-59.) To the contrary, the Supreme Court implicitly rejected such a limitation in the earliest years of the Act, holding that the Board's exercise of its remedial authority should *not* be evaluated based on the "narrow canons" applicable to "ordinary private controversies," because Congress granted the Board the open-ended

authority to exercise "all such remedial powers as will, from case to case, translate into actuality the policies of the Act." *Phelps Dodge*, 313 U.S. at 188 & n.6; *see Va. Elec.*, 319 U.S. at 543 (stressing that "conventional common law or chancery principles" do not limit Board remedies).

More generally, the Supreme Court has cautioned against falling into a "bog of logomachy" when evaluating the Board's exercise of its remedial authority, since the operative question is not what label to assign to a remedy, but whether the remedy bears "appropriate relation to the policies of the Act." *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 348 (1953).  Simply put, the Board's authority to order make-whole relief for direct or foreseeable pecuniary harms turns on whether such relief can fairly be said to effectuate the policies of the Act, not whether it can be fit into the amorphous box of traditional equity practice.

### C.    The Court Lacks Jurisdiction To Entertain Starbucks's Meritless Seventh Amendment Argument

Starbucks similarly claims the Board cannot order make-whole relief, except for backpay, without somehow "intrud[ing] into private-rights adjudications" and running afoul of the Seventh Amendment.  (Br.60-63.)

The Court again lacks jurisdiction to entertain this argument, as Starbucks did not present it to the Board.  29 U.S.C. § 160(e); *Atl. City Elec.*, 5 F.4th at 306-07.  The only gesture toward the Seventh Amendment in Starbucks's motion for reconsideration was a reference to Members Kaplan and Ring's partial dissent in

*Thryv*, which Starbucks opined made "several excellent points." (JA.1979-80.)
Even assuming this vague endorsement was enough to incorporate by reference the
entire dissenting opinion—though it was not—the arguments Starbucks now
advances are incompatible with the position taken by Members Kaplan and Ring.

In direct conflict with Starbucks's position on review, Members Kaplan and
Ring explained that the Board *is* empowered to award make-whole relief for both
direct and indirect pecuniary harms. *Thryv*, 2022 WL 17974951, at *25-29. They
disagreed with the Board majority regarding the necessary degree of causation and
whether to require such relief as a standard remedy, *id.* at *27—objections not
advanced by Starbucks. They further suggested that the Board's remedy "*may
raise a* [Seventh Amendment] issue *in particular cases*" if the Board were to award
make-whole relief for a specific harm that is sufficiently "remote … in the chain of
causation." *Id.* at *27 & n.7 (emphases added). No specific pecuniary harms have
yet been determined here, however, and Starbucks's facial attack on the Board's
remedial authority was not contemplated by Members Kaplan and Ring's dissent.
Starbucks has waived any claim of extraordinary circumstances.

In any event, Starbucks's argument is baseless. The Supreme Court has
made clear that the Seventh Amendment is "no bar" to the power of Congress to
create new rights, "and remedies therefor," and to place the enforcement of such
rights in an administrative agency. *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442,

461 (1977); *see Terson Co. v. Bakery Drivers, Local 194*, 739 F.2d 118, 121 (3d Cir. 1984).  The dispositive inquiry is whether the proceeding in question involves "public rights" versus "private rights."  *Oil States Energy Servs. LLC v. Greene's Energy Grp. LLC*, 138 S. Ct. 1365, 1373 (2018).  The Board's proceedings involve quintessential public rights:  the Act's prohibitions against antiunion discrimination and interference with employees' concerted activities for mutual aid or protection are purely statutory creations designed to advance broader governmental policies.

Indeed, Starbucks's position is foreclosed by the Supreme Court's landmark opinion in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48-49 (1937), which upheld the constitutionality of the Act and squarely rejected the argument that the Seventh Amendment applies to the Board's orders.  As the Court held, the unique statutory rights enforced by the Board are "unknown to the common law," and a Board proceeding "is not a suit at common law or in the nature of such a suit."  *Id.*  The Board's orders are "imposed for violation[s] of the statute" and are not like "money judgment[s] … under the common law."  *Id.*  In other words, the Board's orders "vindicate public, not private rights."  *Va. Elec.*, 319 U.S. at 543.

In response, Starbucks disregards the Supreme Court's primary reasoning and insists that *Jones & Laughlin* only addressed reinstatement and backpay. (Br.62-63.)  But the Supreme Court has explained that *Jones & Laughlin* provided two "separate ground[s]" for rejecting the Seventh Amendment argument:  first,

the right to a jury trial simply does not apply to the Board's enforcement, through administrative adjudications, of the public rights created in the Act; and second, the Board's award of "monetary relief" like backpay may be intertwined with reinstatement such that the Seventh Amendment is not even implicated. *Atlas Roofing*, 430 U.S. at 453-54 & n.10. Starbucks ignores the first holding, which does not turn on the type of relief at issue.[6]

### D.   The Court Lacks Jurisdiction To Entertain Starbucks's Meritless Nondelegation Argument

Equally baseless is Starbucks's invocation of constitutional nondelegation principles to argue that the Board exercises "legislative power" whenever it orders remedial actions that are not specifically enumerated in the Act. (Br.64-65.)

As an initial matter, the Court once again lacks jurisdiction to entertain Starbucks's argument on this point, as Starbucks failed to raise it to the Board. 29 U.S.C. § 160(e); *Atl. City Elec.*, 5 F.4th at 306-07. Nowhere in its motion for reconsideration did Starbucks raise a constitutional nondelegation argument, and on review it has waived any claim of extraordinary circumstances.

---

[6] Accordingly, the Court need not resolve whether the secondary holding in *Jones & Laughlin* applies to other forms of monetary relief designed to make reinstated employees whole, such as the *Thryv* remedy. But Starbucks's circular argument that backpay is unique because it "traditionally" accompanies reinstatement (Br.62-63) makes little sense considering *Jones & Laughlin* was decided just two years after reinstatement-with-backpay became a familiar concept through the Act.

In any event, Starbucks's argument is mistaken. The Constitution permits Congress to "confer substantial discretion on executive agencies to implement and enforce the laws" without running afoul of the nondelegation doctrine. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion). The determinative question is whether Congress has set forth an "intelligible principle" delineating "the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989). The Supreme Court has repeatedly found an "intelligible principle" in statutes that guide an agency's exercise of discretion by requiring conformance to defined policy objectives. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473-74 (2001).

The Act contains just such a principle guiding the Board's exercise of its remedial discretion. Section 10(c) directs the Board to order "such affirmative action … as will effectuate the policies of this Act," 29 U.S.C. § 160(c), and those policies are defined in detail, *e.g.*, 29 U.S.C. § 151. The Supreme Court rejected an early nondelegation challenge to the Board's discretionary authority on the basis that "the policy of [the Act] is so definitely and elaborately stated." *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 165 (1941) (rejecting challenge to Board representation determination); *see Jones & Laughlin*, 301 U.S. at 47 ("[The Act] establishes standards to which the Board must conform."). The limits of the

Board's authority are well defined, such as the requirement that its orders be "remedial, not punitive." *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 361 (1940).

### E.    The Court Lacks Jurisdiction To Entertain Starbucks's Meritless Due Process Argument

Finally, Starbucks claims the Board's Order applying *Thryv* and directing that Nowakowska and Bussiere be made whole in the present case "deprived [it] of fair notice" and violated due process.  (Br.65-67.)

Yet again, the Court is jurisdictionally barred from reaching this argument on review, as Starbucks did not present it to the Board.  29 U.S.C. § 160(e); *Quality Mfg.*, 420 U.S. at 281 n.3.  Starbucks had a full opportunity to raise its present due process argument in its motion for reconsideration, and it has waived any claim of extraordinary circumstances justifying its failure to do so.

In any event, Starbucks's argument is meritless.  In *Thryv*, the Board reasonably determined that its revised make-whole remedy should be applied retroactively to "all pending cases."  2022 WL 17974951, at *21.  The Board observed that respondents' reliance interests will generally be negligible, given that the change is purely remedial and that the Board has utilized similar remedies in prior cases.  *Id.*  Retroactive application of a change in Board policy is the "norm," and the Board is "entitled to exercise its broadest power" when determining retroactivity.  *LIUNA v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 394 (3d Cir. 1994).  The Court will defer to the Board's determination unless shown that

56

retroactive application in a given case would cause a "manifest injustice." *Id.* at

390-95; *accord SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947); *SNE Enters.,*

*Inc.*, 344 NLRB 673, 673 (2005).  Starbucks has attempted no such showing here.

Instead, Starbucks relies on inapposite caselaw while identifying no harms

unique to the present facts.  (Br.65-67.)  The cases cited by Starbucks address the

inapposite question of whether a "conviction or punishment" offends due process,

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249-50 (3d Cir. 2015), which

can include "civil *penalties*" deemed grossly excessive, *BMW of N. Am., Inc. v.*

*Gore*, 517 U.S. 559, 574 n.22 (1996) (emphasis in original).  But the Board's

Order in the present case is remedial, not punitive, and is limited to undoing the

effects of Starbucks's unfair labor practices.  A wrongdoing party cannot be heard

to complain that it only chose to violate federal law because it did not expect to

have to make the victims of its unlawful conduct fully whole.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court

enter a judgment enforcing the Board's Order in full.

Respectfully submitted,

/s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

/s/ Eric Weitz
ERIC WEITZ
*Attorney*
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570
(202) 273-0656
(202) 273-3757

JENNIFER A. ABRUZZO
    *General Counsel*

PETER SUNG OHR
    *Deputy General Counsel*

RUTH E. BURDICK
    *Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

National Labor Relations Board
February 2024

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) |
| | ) Nos.   23-1953 |
| Petitioner/Cross-Respondent | ) 23-2241 |
| | ) |
| v. | ) |
| | ) |
| STARBUCKS CORPORATION d/b/a | ) |
| STARBUCKS COFFEE COMPANY | ) Board Case Nos. |
| | ) 04-CA-252338 et al. |
| Respondent/Cross-Petitioner | ) |

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to L.A.R. 28.3(d) and 46.1(e), I hereby certify that I am a member in good standing of the State Bar of California and am representing an agency of the United States in the present case. *See* L.A.R. 28.3 cmt.

/s/ Eric Weitz
Eric Weitz
Attorney
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570
(202) 273-3757

Dated at Washington, D.C.,
 this 12th day of February, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | Nos.    23-1953 |
| Petitioner/Cross-Respondent | ) | 23-2241 |
| | ) | |
| v. | ) | |
| | ) | |
| STARBUCKS CORPORATION d/b/a | ) | |
| STARBUCKS COFFEE COMPANY | ) | Board Case Nos. |
| | ) | 04-CA-252338 et al. |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), the Board certifies

that its brief contains 12,992 words of proportionally-spaced, 14-point type, and

that the word-processing system used was Microsoft Word 365.  The electronic

version of the brief is identical to the text in the paper copies being filed with the

Court.  The electronic version of the brief has been scanned for viruses with

Microsoft Defender Antivirus version 1.403.3635.0 and no virus was detected.


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570
(202) 273-2960


Dated at Washington, D.C.,
 this 12th day of February, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | Nos.    23-1953 |
| Petitioner/Cross-Respondent | ) | 23-2241 |
| | ) | |
| v. | ) | |
| | ) | |
| STARBUCKS CORPORATION d/b/a | ) | |
| STARBUCKS COFFEE COMPANY | ) | Board Case Nos. |
| | ) | 04-CA-252338 et al. |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2024, I electronically filed the

foregoing document with the Clerk of the Court for the U.S. Court of Appeals for

the Third Circuit using the appellate CM/ECF system.  I certify that the foregoing

document was served on all parties or their counsel of record through the appellate

CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570
(202) 273-2960

Dated at Washington, D.C.,
 this 12th day of February, 2024