# In the United States Court of Appeals for the Third Circuit

---

NATIONAL LABOR RELATIONS BOARD,
*Petitioner/Cross-Respondent,*

*v.*

STARBUCKS CORPORATION, d/b/a STARBUCKS COFFEE COMPANY,
*Cross-Petitioner/Respondent.*

---

*On Review from the National Labor Relations Board,*
*Nos. 04-CA-252338 et al.*

---

## REPLY BRIEF OF CROSS-PETITIONER/RESPONDENT

---

MAURICE BASKIN
LITTLER MENDELSON, PC
  815 Connecticut Ave, N.W.,
  Ste. 400
Washington, D.C. 20006

LISA S. BLATT
  *Counsel of Record*
SARAH M. HARRIS
AARON Z. ROPER
EDWARD L. PICKUP
JOSHUA A. HANLEY*
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue SW
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

*Admitted in Pennsylvania and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

Page

INTRODUCTION ...........................................................................1

ARGUMENT .................................................................................3

I.      NLRB ALJs Are Unconstitutionally Structured .....................................3

II.     The Board's Decision Is Not Supported by Substantial Evidence .......11

III.    Nowakowska's and Bussiere's Illicit Recordings Preclude
        Reinstatement and Backpay .....................................................18

IV.     The Board's Compensatory-Damages Remedy Is Unlawful.................23

        A.      The NLRB Awarded Compensatory Damages............................23

        B.      The NLRA Does Not Authorize Compensatory Damages..........25

        C.      The Board's Reading Poses Serious Constitutional
                Concerns....................................................................30

        D.      The Board's Remedy Violates Due Process Here .......................33

CONCLUSION.............................................................................36

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)...........32

*Advanced Disposal Servs. E. v. NLRB*, 820 F.3d 592 (3d Cir. 2016) ........... 5-7

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ............................................ 6, 8-9

*Calcutt v. FDIC*, 598 U.S. 623 (2023).......................................................12

*CFPB v. Nat'l Collegiate Master Student Loan Tr.*,
    2024 WL 1165116 (3d Cir. Mar. 19, 2024) ........................................9

*Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469 (D.C. Cir. 2020).......14, 33

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ....................................... 4-5, 10

*David Stanley Consultants v. Director*, 800 F. App'x 123 (3d Cir. 2020)........8

*E. Brunswick Eur. Wax Ctr. v. NLRB.*, 23 F.4th 238 (3d Cir. 2022) ........16, 23

*Ford Motor Co. v. NLRB*, 305 U.S. 364 (1939)....................................10

*Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010)...................................1, 5

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) ...................33

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)........................31

*Great-W. Life & Ann. Ins. v. Knudson*, 534 U.S. 204 (2002)...........................27

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) ..................................4

*ILGWU v. Quality Mfg.*, 420 U.S. 276 (1975).........................................6

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).......................................31

*K&R Contractors LLC v. Keene*, 86 F.4th 135 (4th Cir. 2023)..........................9

*Lawson v. FMR LLC*, 571 U.S. 429 (2014).........................................29

*Lou's Transp., Inc. v. NLRB*, 945 F.3d 1012 (6th Cir. 2019)...........................24

*Lucia v. SEC*, 585 U.S. 237 (2018) .....................................................4

*McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995)....................18

*MCPC, Inc. v. NLRB*, 813 F.3d 475 (3d Cir. 2016).........................12-13, 17, 20

*Med. Ctr. of Beaver Cnty. v. NLRB*, 716 F.2d 995 (3d Cir. 1983) ...................13

*Napleton 1050, Inc. v. NLRB*, 976 F.3d 30 (D.C. Cir. 2020)...........................25

*Nat'l Licorice Co. v. NLRB*, 309 U.S. 350 (1940)........................................31, 33

*New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272 (3d Cir. 2024)... 8, 34-35

*NLRB v. FedEx Freight, Inc.*, 832 F.3d 432 (3d Cir. 2016)..............................34

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ........................ 30-33

*NLRB v. Louton, Inc.*, 822 F.2d 412 (3d Cir. 1987)........................................24

*NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344 (1953)..................................27

*NLRB v. Stackpole Carbon Co.*, 128 F.2d 188 (3d Cir. 1942) ........................24

*NLRB v. Strong*, 393 U.S. 357 (1969).......................................................26

*Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325 (2018).........31

Cases—continued:

*Panzarella v. Navient Sols., Inc.*, 37 F.4th 867 (3d Cir. 2022) .......................26
*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177 (1941) ..................................... 26-27
*Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146 (1941) .............................32
*Quick v. NLRB*, 245 F.3d 231 (3d Cir. 2001) ................................................25
*SEC v. Jarkesy*, No. 22-859 (U.S. argued Nov. 29, 2023).............................3, 7
*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020)......................................... 3-4
*Smith v. Bd. of Governors*, 73 F.4th 815 (10th Cir. 2023) .................................8
*Somerset Valley Rehab. & Nursing Ctr. v. NLRB*,
    825 F.3d 128 (3d Cir. 2018) ........................................................... 6-7
*State Farm v. Campbell*, 538 U.S. 408 (2003)..............................................23
*Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984) ................................................6
*Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (2022),
    *appeal docketed*, No. 23-60132 (5th Cir. argued Feb. 6, 2024) ..........*passim*
*UAW-CIO v. Russell*, 356 U.S. 634 (1958) ............................................. 25-26
*UC Health v. NLRB*, 803 F.3d 669 (D.C. Cir. 2015) .........................................6
*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) .............................................5
*United States v. Burke*, 504 U.S. 229 (1992) ........................................... 28-29
*United States v. L. A. Tucker Truck Lines*, 344 U.S. 33 (1952) ........................8
*United States v. Tohono O'Odham Nation*, 563 U.S. 307 (2011) ....................27
*Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533 (1943).............................24, 26, 31
*Whole Foods Mkt., Inc.*, 363 NLRB 800 (2015)............................................21
*Wiener v. United States*, 357 U.S. 349 (1958).................................................4

## CONSTITUTION, STATUTES, AND REGULATION

U.S. Const.
    art. III ...............................................................................................30
    amend. VII.........................................................................................30
28 U.S.C. § 2201 .....................................................................................10
42 U.S.C. § 2000e-5 ............................................................................ 28-29
Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* .................................1
Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.* .................................7
National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*.............*passim*
    § 151.................................................................................................32
    § 157.................................................................................................21
    § 160(c) ....................................................................................*passim*
    § 160(e) ..................................................................................6, 10, 34
    § 160(f).............................................................................................10

Constitution, Statutes, and Regulation—continued:

National Recovery Act, Pub. L. No. 73-67, ch. 90, 48 Stat. 195 (1933) ............32
12 C.F.R. § 263.39(b)(2)..............................................................................8

## OTHER AUTHORITY

*Damages*, Black's Law Dictionary (11th ed. 2019) ...........................................24

**INTRODUCTION**

The Administrative Procedure Act demands that agencies like the National Labor Relations Board (NLRB) hew to the bounds of their constitutional and statutory authority. But the NLRB's order below trampled those boundaries in multiple independent respects warranting vacatur.

*First*, an administrative law judge (ALJ) who was unconstitutionally insulated from presidential oversight adjudicated the case. That ALJ enjoyed three layers of for-cause removal protections—exceeding the constitutional limits on removal from *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010). The NLRB would carve out a special, adjudicator-specific exemption for removal restrictions. But the Supreme Court has rejected multilayer restrictions for *any* type of executive officers, and the Fifth Circuit deemed unconstitutional materially indistinguishable removal restrictions for SEC ALJs. Starbucks' structural separation-of-powers challenge need not be raised to the agency. And unless this Court remedies that constitutional harm now, Starbucks faces further proceedings before unconstitutionally insulated ALJs, either on remand or in compliance proceedings.

*Second*, the NLRB violated the bedrock substantial-evidence standard in holding that Starbucks unlawfully terminated two partners, Echo

Nowakowska and Tristan Bussiere, whose repeated, poor customer service and multiple policy violations amply justified their terminations. The NLRB insists that Starbucks' purported anti-union animus, not the partners' misconduct, must be the explanation. But the NLRB downplayed or outright ignored concessions that these partners argued with customers, distracted coworkers, and committed repeated disciplinary infractions that would prompt termination of anyone else.

*Third*, the NLRB improperly dismissed Starbucks' independent defense that it would have terminated Nowakowska and Bussiere had Starbucks known at the time that they made 30-plus unauthorized, illicit recordings of managers, coworkers, and customers. The NLRB asserts that the National Labor Relations Act (NLRA) protects virtually *all* workplace recordings— even if a single employee is not coordinating with anyone else, and even if the recordings capture customers, coworkers, and countless conversations unrelated to union organizing or altercations with management. That unprecedented NLRA interpretation would vitiate employers' and customers' interests against intrusive, surreptitious, often-illegal surveillance and would deter customers from returning.

*Fourth*, the Board *sua sponte* imposed a novel compensatory-damages remedy that the NLRA does not authorize. The NLRB claims that compensatory damages are nothing new. But this is the first legal remedy the NLRB has imposed, and multiple constitutional principles prevent the NLRB from pursuing this uncharted course.

## ARGUMENT

### I. NLRB ALJs Are Unconstitutionally Structured

1. NLRB ALJs are inferior officers with three layers of removal protection. SEC ALJs—which the NLRB does not distinguish—enjoy the same protections. If the Supreme Court holds in *SEC v. Jarkesy*, No. 22-859, that SEC ALJs' tenure protections are unconstitutional, NLRB ALJs' protections fall too. Br. 23.

Even if *Jarkesy* leaves this issue open, NLRB ALJs' removal protections are unconstitutional. The "general rule" is that the President enjoys "unrestricted removal power," rendering multiple layers of removal restrictions on inferior Executive Branch officers unconstitutional. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198 (2020). Because ALJs are inferior Executive Branch officers, their multilayer tenure protections are plainly unconstitutional. Br. 25 n.1.

The NLRB (at 18) emphasizes ALJs' purportedly "limited," "adjudicative" role "overseeing evidentiary hearings and making recommendations." But the Supreme Court has observed that ALJs exercise "significant discretion," "issue decisions," and carry out "important functions" by "critically shap[ing] the administrative record." *Lucia v. SEC*, 585 U.S. 237, 248 (2018) (citation omitted).

The NLRB claims that Congress enjoys "greater leeway in granting removal protections to adjudicators." NLRB Br. 18-19 (citing *Wiener v. United States*, 357 U.S. 349, 355-56 (1958); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935); *Collins v. Yellen*, 141 S. Ct. 1761, 1783 n.18 (2021)). But ALJs exercise *executive* power, and there is no special removal rule authorizing multilayer protection for some types of executive officers. Quite the contrary, the Supreme Court has held that, for "inferior officers with limited duties and no policymaking or administrative authority," a *single* layer of removal protection marks "the outermost constitutional limits." *Seila Law*, 140 S. Ct. at 2199-200 (citation omitted). NLRB ALJs' triple-layered protections are not a close call.

The NLRB (at 19-20) contends that the Board, "on behalf of the President, possesses adequate alternative means of controlling its judges" beyond

removal. But the Board itself is insulated from presidential control through for-cause removal restrictions. Br. 26. And the Supreme Court has rejected such functional arguments. "Broad power over [officials'] functions is not equivalent to the power to remove [them]." *Free Enter.*, 561 U.S. at 504. Even if the Board could intervene to "procur[e] [its] preferred outcome," that would not provide the presidential "lines of accountability" the Constitution requires. *United States v. Arthrex, Inc.*, 594 U.S. 1, 16 (2021).

The NLRB (at 20) contends that the removal protections in *Free Enterprise Fund* "were far more restrictive" than NLRB ALJs' "good cause" protections. The Supreme Court has rejected that distinction, holding that even "for cause" protections unconstitutionally limit the President's removal power. *Collins*, 141 S. Ct. at 1786-87. "'[F]or cause' does not mean the same thing as 'at will.'" *Id.* at 1787 (cleaned up).

2. The NLRB (at 12-15) claims Starbucks forfeited this challenge by failing to raise it before the Board. But Starbucks did not need to exhaust this argument below. Constitutional challenges "implicat[ing] fundamental separation of powers concerns" and the Board's "power to act" fall within the "extraordinary circumstances" exception to the NLRA's exhaustion requirement. *Advanced Disposal Servs. E. v. NLRB*, 820 F.3d 592, 598 (3d Cir. 2016)

(citation omitted); 29 U.S.C. § 160(e); Br. 27-28. Separation-of-powers challenges strike at the heart of the Board's power to adjudicate cases and its decision-making structure. And, unlike other challenges that might be entangled with the merits of particular cases, separation-of-powers challenges raise trans-substantive issues beyond the agency's expertise. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 194 (2023); *cf. Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896 n.7 (1984); *ILGWU v. Quality Mfg.*, 420 U.S. 276, 281 n.3 (1975) (both cited at NLRB Br. 14, involving First Amendment and procedural-due-process challenges).

Thus, in *Advanced Disposal*, this Court reached an unexhausted challenge to the Board's lack of a quorum because that separation-of-powers challenge was "no mere procedural technicality" but rather questioned the legality of all the quorum-less Board's actions. 820 F.3d at 598-601; *accord, e.g.*, *UC Health v. NLRB*, 803 F.3d 669, 672 (D.C. Cir. 2015). So too here, unconstitutional restrictions on ALJs impugn the validity of the ensuing decisions and impose "here-and-now" constitutional injuries. *Axon*, 598 U.S. at 191.

The NLRB claims that this Court has limited *Advanced Disposal* to challenges to the *Board*'s own composition. NLRB Br. 12-13 (citing *Somerset Valley Rehab. & Nursing Ctr. v. NLRB*, 825 F.3d 128 (3d Cir. 2018)). Not so.

This Court in *Somerset* refused to entertain an unexhausted challenge to the Acting General Counsel's authority under the Federal Vacancies Reform Act because the challengers pressed a novel, "extra-statutory" exhaustion exception. 825 F.3d at 143 n.10. The Court distinguished *Advanced Disposal* as a case involving the "extraordinary circumstances" exception—an exception the *Somerset* challengers did not brief. *Id.* at 142. Further, the unexhausted challenge in *Somerset* rested on "the strictures of [a] statute"—the longstanding Federal Vacancies Reform Act—not a "constitutional infirmity" that the Supreme Court recently identified. *Id.* at 140, 142, 143 n.10. If the Supreme Court in *Jarkesy* deems ALJs' removal restrictions unconstitutional, this Court should not ignore that structural defect.

More broadly, distinguishing between structural challenges to the Board and ALJs for exhaustion purposes is nonsensical. If, as the NLRB (at 13) apparently agrees, courts may hear unexhausted challenges to Board removal restrictions, the same rule should apply to ALJ removal restrictions. Both sets of challenges systemically impugn the agency's decision-making.

Both sets of challenges fall outside the agency's expertise. And both sets of challenges can justify vacatur.[1] *Axon*, 598 U.S. at 194.

Regardless, requiring exhaustion here would result in the very "piece-meal appeals" the exhaustion requirement aims to prevent. *New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 280 (3d Cir. 2024) (citation omitted). Barring this Court's intervention, Starbucks will face compliance proceedings before an unconstitutionally insulated ALJ. Br. 28. Starbucks' inevitable appeal from those proceedings would only draw out this already lengthy litigation.

3. This Court should declare NLRB ALJs' multilayer removal protections unconstitutional and remand to a constitutionally accountable adjudicator. Br. 28-29.

---

[1] Because Starbucks invokes the NLRA's "extraordinary circumstances" exception, the NLRB's cases (at 13) about regimes lacking similar exceptions are irrelevant. *See Smith v. Bd. of Governors*, 73 F.4th 815, 822-24 (10th Cir. 2023) (involving 12 C.F.R. § 263.39(b)(2), under which the Federal Reserve "need not" consider unexhausted issues); *United States v. L. A. Tucker Truck Lines*, 344 U.S. 33, 35-38 (1952) (non-statutory exhaustion). One of this Court's unpublished decisions purported to apply the "extraordinary circumstances" exception but did not identify a statutory hook or even cite this Court's extraordinary-circumstances precedent. *David Stanley Consultants v. Director*, 800 F. App'x 123, 128 (3d Cir. 2020).

The NLRB (at 15) demands that Starbucks prove "harm arising from any purported constitutional defect." But Starbucks faces the "here-and-now" injury of further unconstitutional proceedings. *See Axon*, 598 U.S. at 194 (citation omitted); *accord CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 2024 WL 1165116, at *12 (3d Cir. Mar. 19, 2024). If this Court vacates and remands, Starbucks will be back before an unconstitutionally insulated ALJ. If this Court affirms, Starbucks faces remedial proceedings before an ALJ on damages. Br. 28. The NLRB's speculation (at 16-17) that "[m]any cases settle at the compliance stage" confirms the harm. Starbucks faces further proceedings before an unconstitutionally structured agency, and the lack of judicial recourse compounds pressures to settle, leaving constitutional violations forever unremedied.

The near-certainty of future proceedings distinguishes the Board's cases (at 15-17), which asked challengers to show prejudice from *completed* agency adjudications. *E.g.*, *K&R Contractors LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023). Here, the ALJ's unconstitutional removal protections will injure Starbucks in imminent *future* proceedings.

The NLRB (at 16-17) suggests this Court lacks "jurisdiction" to grant "prospective relief." But this Court has "jurisdiction" upon the filing of a review or enforcement petition and can "set[] aside … the order of the Board"— Starbucks' lead ask here. 29 U.S.C. § 160(e)-(f). Because this Court has "jurisdiction," it may also issue a declaratory judgment and tailor relief "in accordance with … equitable principles." 28 U.S.C. § 2201; *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939).

Even if Starbucks must show retrospective harm, it has. Starbucks need only show that the ALJ "might have altered his behavior" given presidential supervision. *Collins*, 141 S. Ct. at 1789. The NLRB (at 16) objects that the ALJ caused no harm because the "Board itself carefully reviewed the judge's disputed rulings." But the Board defers to the ALJ's credibility rulings. JA7 n.2. Had extra accountability deterred the ALJ's one-sided credibility determinations, *e.g.*, JA25-26 & n.29, the Board's order may have differed.

Meanwhile, the NLRB's position would preclude courts from ever remedying structural constitutional violations involving inferior officers. No retrospective harm would warrant vacatur, and no prospective harm would warrant remand to a proper adjudicator. That Catch-22 would implausibly reward constitutional violations.

## II. The Board's Decision Is Not Supported by Substantial Evidence

The Board's conclusions that Starbucks unlawfully terminated Nowakowska and Bussiere and unlawfully reduced Nowakowska's hours are not supported by substantial evidence.

1. ***Nowakowska's Termination.*** Starbucks lawfully fired Nowakowska because she consistently provided poor customer service—irrespective of her union organizing. Immediately before her firing, Nowakowska was, in the ALJ's words, "intemperate and rude" to a customer seeking two pats of butter. JA35. The NLRB (at 28) acknowledges the butter incident was not "ideal customer service" yet says it would not alone justify termination.

But Nowakowska had a long track record of violations that, combined with the butter incident, justified termination. As her termination notice explained, Starbucks terminated Nowakowska "for continued failure to act in accordance with Starbucks guiding principles and Mission and Values," including four instances where Nowakowska provided sufficiently poor customer service to prompt discipline or coaching. JA1436. Nowakowska admitted to numerous policy violations, including raising her voice at her manager, not telling customers their drinks were ready, and not greeting customers. Br. 31-36. The Board's decision ignored these conceded previous violations.

The NLRB (at 29) says Starbucks failed to meet its "burden" to "prove that it *would have* discharged Nowakowska." *Accord* NLRB Br. 26, 33 (same for Bussiere's termination and Nowakowska's hours reduction). But courts of appeals must vacate Board orders if the agency's reasoning is arbitrary, including because the Board ignored "significant countervailing evidence in the record." *MCPC, Inc. v. NLRB*, 813 F.3d 475, 493 (3d Cir. 2016). When, as here, the Board overlooks relevant evidence, this Court does not require the challenger to show the evidence would have changed the agency's outcome. Rather, courts must "remand for the Board to take into account" that evidence. *Id.*; *accord Calcutt v. FDIC*, 598 U.S. 623, 629-30 (2023).

The NLRB (at 28-29) claims Starbucks fired Nowakowska while disciplining others for similar misconduct. That ignores the ALJ's uncontested finding that Starbucks had fired partners for rudeness to customers and other policy violations. JA34-35.

The NLRB (at 28-29) dismisses Nowakowska's earlier misconduct (*i.e.*, slamming drinks on the counter and not calling out customers' names) as irrelevant because the Board deemed her *discipline* for that misconduct to be unlawful retaliation based on suspicious timing. JA32-33. But the Board did

not discredit the underlying misconduct. For good reason: Nowakowska admitted to these incidents, Br. 33-34, and the NLRB must consider admitted incidents of wrongdoing. *Med. Ctr. of Beaver Cnty. v. NLRB*, 716 F.2d 995, 1000 (3d Cir. 1983).

The NLRB (at 24-25, 27-31) recites other circumstances, including Starbucks' decision not to challenge some of the Board's unfair-labor-practice findings, that purportedly contextualize Starbucks' decisions. But as the NLRB (at 22-23, 28) seemingly recognizes, such evidence goes to the first step of *Wright Line*: whether protected activity was "a motivating factor" in the adverse action. This appeal centers on the second step: whether Starbucks "would have taken the same action" regardless of its supposedly bad motive. NLRB Br. 23. At this stage, this Court evaluates Starbucks' policies and practices to determine whether Starbucks would have fired Nowakowska regardless of her protected activities. *MCPC*, 813 F.3d at 487-88. Because the NLRB ignored evidence that rudeness to customers is a fireable offense, and Starbucks has consistently terminated similarly situated partners, the Board's analysis demands vacatur. Br. 31, 35.

2. ***Bussiere's Termination.*** Starbucks lawfully fired Bussiere for persistent workplace disruptions, regardless of his protected activity. Bussiere

spread a false rumor about a coworker and racked up recurrent infractions—
showing up late, disobeying managers' instructions, leaving a store short-
staffed, and mocking a supervisor. The Board's failure to grapple with con-
trary evidence flunks substantial-evidence review. Br. 37-39.

The NLRB (at 31) fixates on the first stated ground for termination—
Bussiere's rumor-spreading—which the ALJ deemed pretextual because
Starbucks supposedly did not prove that Bussiere "knew" the rumor was false.
JA36. According to the NLRB (at 31), that "pretext" finding means that Star-
bucks "'fails by definition' to satisfy its *Wright Line* burden" to show that
Starbucks would have fired Bussiere regardless. That reasoning is "a funda-
mental misstatement of *Wright Line*"; even after finding an employer's
explanation pretextual, the Board cannot "short circuit[] consideration of the
whole record." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 482 (D.C.
Cir. 2020).

Here, the Board ignored six incidents amply justifying Bussiere's termi-
nation. Br. 37-39. The NLRB (at 33) now concedes that Bussiere's hour-late
arrivals to work were "actual misconduct." The NLRB (at 32-33) urges the
Court to ignore other incidents—Bussiere's refusal to wear his hat and failure

to stock the pastry case—because Starbucks documented them in a disciplinary notice the Board deemed unlawful. But, as with Nowakowska, that separate finding does not relate to the underlying misconduct. Rather, the Board and ALJ ruled that the November discipline was based "in part" on a separate incident where Bussiere complained about Vaughan. JA33. The Board must still consider other incidents to which Bussiere admitted. JA326-27, 331.

The NLRB (at 33) says the Board rightly ignored another partner's complaints about Bussiere because that partner was "annoy[ed]" by Bussiere's protected activities and "bias[ed]." But the partner complained about Bussiere's unprotected activities, including giving a supervisor "a panic attack" by "tr[ying] to instruct her on how to do HER job." JA27 n.32, 1455. The ALJ's reasoning would illogically discredit as "biased" anyone who reports a coworker's misconduct. JA25 n.29.

The NLRB (at 32-33) notes that Starbucks did not formally discipline Bussiere for leaving a store short-staffed and mocking his supervisor. But two managers counseled Bussiere over the staffing incident. JA24. And Bussiere

mocked his supervisor a mere week before his termination. JA26 & n.30. Employers need not formally punish employees for every individual policy violation that cumulatively justifies termination.

Moreover, the one-week turnaround between the supervisor mocking and termination belie the NLRB's passing suggestion (at 31-32) that there was something nefarious about the timing of Bussiere's termination. Starbucks knew about Bussiere's labor activities since July 2019, JA18, but fired him in February 2020 only after cascading policy violations, JA27.

The NLRB (at 32) claims that Starbucks forfeited arguments about Bussiere's other disciplinary problems before the Board. Not so. As Starbucks told the ALJ, Starbucks terminated Bussiere both "for spreading a false rumor that another partner was going to be terminated, *and for affecting the overall environment and partner morale*." JA1897 (emphasis added). Starbucks' brief to the Board likewise emphasized Bussiere's "impact … on employee morale and the store environment." JA1958. The agency thus "received adequate notice of" Starbucks' argument. *See E. Brunswick Eur. Wax Ctr. v. NLRB.*, 23 F.4th 238, 250 (3d Cir. 2022).

3. ***Nowakowska's Hours.*** Starbucks cut hours across the board at the Broad & Washington store to address shifting customer demand. Br. 40-41;

NLRB Br. 26.  The Board's conclusion that Starbucks improperly reduced Nowakowska's hours rests on the faulty premise that she experienced "one of the largest reductions."  JA33.  In fact, Nowakowska's reduction tracked coworkers'.  Br. 41-42.

The NLRB does not dispute Starbucks' math.  Instead, the NLRB (at 26) claims the spreadsheets underlying those calculations (JA1678-1727) include hours at other stores.  The NLRB never made that argument below and cannot raise that post hoc explanation now.  *See MCPC*, 813 F.3d at 490.  Regardless, the spreadsheets are specific to Broad & Washington.  Each lists the Broad & Washington store number (52857), JA1678, 1681, 1714, 1720, and labels the total hours as "Store total hours," JA1726-27.  The totals do not track the hours scheduled, *see* NLRB Br. 26, only because partners swap or miss shifts.  *E.g.*, JA525.

Anyway, the schedules also show that Nowakowska's hours tracked her coworkers'.  Between September and November, Nowakowska lost 34% of her hours.  JA647-666.  That resembles Christi Kirchner's and Madeline Jarvis' 38% and 27% reductions, respectively.  JA647-666.  By December, Nowakowska's hours leveled out, like her coworkers'.  JA667-672.

The ALJ thought that two other baristas (Shams and Siburt) received increased hours, JA33, overlooking Shams' time off and Siburt's additional late shifts. Br. 42. The NLRB (at 26) asserts without explanation that both baristas' scheduled hours increased regardless. But in August and September 2019—Shams' last full-time months before the cuts—he worked 113 and 144 hours, respectively. JA1678, 1681-83. In December 2019, after the cuts, he worked 104 hours. JA1720-21; *accord* JA647-666. And Siburt went from working three late shifts in all of November to three late shifts in a single week in December. JA662-66, 668. Those added shifts fully account for her hours staying flat from November (133 hours) to December (132 hours). JA1715, 1721; *accord* JA648-672. The decisions below grapple with none of this.

## III. Nowakowska's and Bussiere's Illicit Recordings Preclude Reinstatement and Backpay

Nowakowska and Bussiere independently cannot obtain reinstatement and backpay because they surreptitiously recorded coworkers and customers more than 30 times, violating Starbucks policy and Pennsylvania law. Br. 42-50.

1. After-acquired evidence of employee misconduct precludes reinstatement and backpay unless the employer actually knew of the misconduct *before* termination. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352,

359-60 (1995).  Substantial evidence does not support the Board's conclusion that Starbucks had actual, advance knowledge of Nowakowska's and Bussiere's misconduct.  Br. 44-46.  Significantly, the NLRB identifies no evidence that Starbucks knew Nowakowska and Bussiere were recording customers and coworkers.  *See* Br. 36.  Starbucks learned about the recordings only after Nowakowska and Bussiere responded to subpoena requests in agency proceedings.  JA1948.

At best, the NLRB's evidence (at 35-36) suggests that Starbucks knew that Nowakowska and Bussiere *attempted* to record Manager Vaughan, as Vaughan and another manager testified, JA434-35, 827.  The NLRB (at 35) misleadingly quotes the second manager (Dragone) as saying that Bussiere "was recording any conversations" with Vaughan.  The manager's actual testimony:  that Vaughan had "a *concern* that [Bussiere] was recording."  JA516 (emphasis added).  Likewise, a management coach (Maimon) reported that Vaughan received "questions" about videoing from other partners, JA807, not that videos existed, *contra* NLRB Br. 35-36.  Moreover, Vaughan shut down multiple attempts to record him, and Nowakowska and Bussiere seemingly complied.  JA434-435.

Thus, before terminating the partners, Starbucks believed Nowakowska and Bussiere stopped recording when asked, not that they defied their manager's instructions. Even if Starbucks knew about attempts to record Vaughan, that would certainly not show Starbucks knew that Nowakowska and Bussiere recorded customers and coworkers—an especially concerning invasion of privacy. Br. 49; *see, e.g.*, JA1610.

The NLRB (at 36) cites purported "transcripts" Bussiere sent Vaughan before Bussiere's termination, including a one-word reference to a "customer" within a 10-page text message. JA687. The Board did not invoke the transcripts, precluding agency lawyers from doing so now. *See MCPC*, 813 F.3d at 490. Regardless, the reasonable inference was that Bussiere was reconstructing conversations, not confessing to a fireable offense. Br. 45. The "customer" statement the NLRB cites—":) good!"—contains an emoticon that would not appear in a real transcript. JA687

Ultimately, the NLRB (at 36) faults Starbucks for not investigating suspected recordings. But as the NLRB (at 35) admits, the after-acquired-evidence defense applies unless Starbucks was "already aware" of the misconduct. Mere suspicions do not suffice.

2. This Court should reject the Board's alternative contention (at 37) that the NLRA categorically protects "audio or visual recordings in the workplace." Br. 46-50. The NLRB (at 37-38) cites no precedent permitting mass customer and coworker recordings. Previous Board cases permitted limited recordings of management for use as evidence in judicial or administrative proceedings. *E.g.*, *Whole Foods Mkt., Inc.*, 363 NLRB 800, 802 (2015) (collecting cases). Nothing in the NLRA suggests that Congress authorized constant, pervasive, and disruptive workplace surveillance. Br. 47-50.

Moreover, most of Bussiere's 30-plus recordings were not "concerted," as required for NLRA protection. 29 U.S.C. § 157; Br. 48. Bussiere allegedly told Nowakowska that he would record one meeting, JA320, not that he had a "plan to begin recording managers," *contra* NLRB Br. 38. The NLRB (at 38) asserts that Bussiere's other, uncoordinated recordings "further[ed] … concerted activities and union organizing," yet cites no supporting evidence. Bussiere testified that he "started just recording" to protect *himself*. JA353. If the NLRA protects self-interested individual recording, every union-involved worker could surreptitiously record every shift in violation of company policy and state law, nullifying the NLRA's concerted-activity requirement.

Further, Nowakowska's and Bussiere's recordings in public areas of the store inevitably captured coworkers and customers, undermining Starbucks' compelling interest in employee and customer privacy.  Br. 49-50.  The NLRB (at 39) responds that the recordings did not capture sensitive conversations (at least in the recordings Bussiere retained) and Starbucks has its own security cameras.  Whatever the recordings actually captured, letting employees secretly record customers and coworkers threatens customers' trust and destroys workplace dynamics.  Starbucks tells employees about its security cameras, which are generally visible, only capture picture, and raise no similar concerns.  *See* JA18, 1328.  The NLRB (at 39) notes that Starbucks permits recordings "protected by federal labor laws."  But the NLRA (and Pennsylvania law) do not protect the recordings here.

The NLRB (at 37-39) incorrectly alleges that Starbucks forfeited the arguments that (1) Bussiere's activities were not "concerted," and (2) Nowakowska recorded customers or non-managers.  But, before the agency, Starbucks argued that Bussiere's "recording other employees and customers … would not be protected activity because it would have no part in concerted activities."  JA1972 (reconsideration brief to the Board).  And Starbucks emphasized that "Nowakowska recorded … Starbucks partners

(managers and non-managers) and even customers." JA1916 (post-hearing brief to the ALJ); *accord* JA1947, 1952, 1972, 1976.

## IV. The Board's Compensatory-Damages Remedy Is Unlawful

The Board's novel compensatory-damages award independently warrants vacatur. The NLRA does not authorize compensatory damages, and such unprecedented relief raises serious constitutional concerns. Br. 59-67. This question of law receives "plenary," not abuse-of-discretion, review. *See E. Brunswick*, 23 F.4th at 250; *contra* NLRB Br. 11, 40.

### A. The NLRB Awarded Compensatory Damages

This is one of the first cases applying the Board's 2022 decision to routinely award "all direct or foreseeable pecuniary harms," from credit-card fees to car payments. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *1, *15 (2022), *appeal docketed*, No. 23-60132 (5th Cir. argued Feb. 6, 2024). That remedy plainly grants compensatory damages by seeking to "redress the concrete loss that the [employee] suffered by reason of the [employer's alleged] wrongful conduct." *See State Farm v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted); Br. 52-53; Chamber Br. 23-28.

The Board's command that Starbucks "compensate Bussiere and Nowakowska for any direct or foreseeable pecuniary harms" JA7 n.3, far exceeds the traditional backpay remedy. That order instead compels Starbucks to pay damages, *i.e.*, "[m]oney … ordered to be paid to[] a person as compensation for loss or injury." *Damages*, Black's Law Dictionary (11th ed. 2019).

The NLRB (at 43-44) disclaims awarding "damages" at all, citing 1940s cases recognizing that the Board's then-extant remedies, such as backpay and refunded union dues, "vindicate public, not private rights." But those cases undermine the Board's expansive new damages remedy. In the 1940s, courts blessed modest awards like reinstatement with backpay—the paradigmatic statutory remedy. *NLRB v. Stackpole Carbon Co.*, 128 F.2d 188, 189 (3d Cir. 1942). The Supreme Court likewise approved a refund of mandatory union dues. *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 541 (1943). Those cases do not endorse the freestanding damages awards the Board seeks here.

None of the Board's other court-of-appeals citations (at 43) uphold anything resembling compensatory damages. Employers in most of those cases did not dispute that the monetary remedies were "included in th[e] umbrella" "of the back pay award." *Lou's Transp., Inc. v. NLRB*, 945 F.3d 1012, 1026 (6th Cir. 2019); *accord NLRB v. Louton, Inc.*, 822 F.2d 412, 413-14 (3d Cir.

1987); *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 39-50 (D.C. Cir. 2020). The one relevant case suggests the Board cannot issue questionable new remedies—there, legal fees. *Quick v. NLRB*, 245 F.3d 231, 256-57 (3d Cir. 2001). Anyway, the remedies in those cases resemble backpay because they ensure that wrongfully terminated employees get the benefits of their employment contracts. *Thryv* blows the hinges off that limitation, awarding full-bore compensatory damages, like missed mortgage payments, credit-card late fees, and child-care expenses, unrelated to any statutorily authorized equitable relief.

### B. The NLRA Does Not Authorize Compensatory Damages

1. ***Text.*** The NLRA authorizes orders that employers (1) "cease and desist from" unfair labor practices and (2) "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." 29 U.S.C. § 160(c). That text limits the Board to equitable remedies, not legal remedies like compensatory damages. Br. 53-55.

As the Supreme Court has long held, the NLRA does "not establish a general scheme authorizing the Board to award full compensatory damages." *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958). The NLRB (at 44 n.3) dismisses this statement as "dicta." But *Russell*'s consideration of what "Congress … authoriz[ed] the Board" to do undergirds the Court's holding

25

that state-law tort and NLRA remedies do not "conflict." 356 U.S. at 643-44. Regardless, Supreme Court "guidance—dicta or not—warrants [this Court's] attention." *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 884 (3d Cir. 2022). *Russell* bars compensatory damages.

The NLRB (at 40, 42, 44-45) asserts the power to select *any* remedy that the agency believes would "best effectuate the policies of the Act." But section 10(c) limits the Board to ordering only "*affirmative action* … as will effectuate the policies of [the Act]." 29 U.S.C. § 160(c) (emphasis added). Compensatory damages are not "affirmative action." This case thus does not implicate the Board's discretion over remedies "within its powers." *NLRB v. Strong*, 393 U.S. 357, 358 (1969) (cited at NLRB Br. 42).

The NLRB (at 41, 45-46) mischaracterizes Starbucks as arguing that "affirmative action" is "*limited* to reinstatement with or without backpay." Starbucks agrees that other *equitable* remedies are available, like hiring pro-union workers, *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 188-89 (1941), or refunding union dues, *Va. Elec.*, 319 U.S. at 539 (both cited at NLRB Br. 45-46). Section 10(c) simply prohibits *legal* remedies, like compensatory damages.

The NLRB (at 49-51) attacks the equitable-versus-legal distinction as outdated. But "many" statutes draw that distinction, which courts "are accustomed to pursuing." *Great-W. Life & Ann. Ins. v. Knudson*, 534 U.S. 204, 217 (2002). For example, the Court of Federal Claims' jurisdiction to issue "damages" generally precludes its "power to provide equitable relief." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 322 (2011). Conversely, section 10(c)'s reference to "affirmative action" limits the NLRB to equitable relief.

The NLRB's authorities (at 50-51) do not "implicitly reject[]" limitations on the Board's power to impose legal remedies. *NLRB v. Seven-Up Bottling Co.* confirms the Board's discretion to choose among remedies when the Board acts "within the scope of its authority"—the problem is, no authority permits legal remedies. 344 U.S. 344, 348 (1953). And *Phelps Dodge* recognizes the NLRB's discretion to select *equitable* relief, like requiring an employer to hire pro-union employees, that might not be available "in ordinary private controversies." 313 U.S. at 188. Again, that discretion excludes legal remedies

2. Other interpretive tools confirm that section 10(c) authorizes equitable relief only.

***Statutory Context.*** Section 10(c)'s lone example of "affirmative action"—"reinstatement of employees with or without backpay"—is classic equitable relief, signaling that section 10(c) permits only equitable relief. Br. 55-56. The NLRB has no response.

The NLRB's reading also produces anomalies. Section 10(c) authorizes "affirmative action including reinstatement … with or without backpay," but prohibits "reinstatement" or "any back pay" for employees fired "for cause." 29 U.S.C. § 160(c). The NLRB's reading thus bizarrely permits the NLRB to award multitudinous damages to workers fired for cause, but not reinstatement with backpay. Br. 56; Chamber Br. 17-18. The NLRB (at 46 n.4) claims that "nothing in *Thryv* suggests the Board would award" compensatory damages to workers fired for cause. But whatever the Board might actually do, the NLRB's reading still produces an unexplainable textual anomaly.

***Other Statutes.*** Related statutes underscore section 10(c)'s limitation to equitable relief. Significantly, Congress used parallel language in Title VII—authorizing "affirmative action" including "reinstatement … with or without back pay"—and expressly characterized that relief as "equitable." 42 U.S.C. § 2000e-5(g)(1). That language "does not allow awards for compensatory … damages," *United States v. Burke*, 504 U.S. 229, 238 (1992), signaling

that section 10(c) does not either.  Br. 56-57; Chamber Br. 19-21.  The NLRB's contention (at 48) that *Burke* rejected broader compensatory remedies than what the Board authorized in *Thryv* misses the point.  *Burke* held that Title VII permits only equitable relief, and damages are not equitable.

The NLRB (at 47-48) insists that Title VII and section 10(c) are "not conterminous" because Title VII, unlike section 10(c), permits "other equitable relief."  The NLRB (at 48, 50) suggests that only this express reference to equity forecloses compensatory damages.  But by authorizing "*other* equitable relief," Congress signaled that the preceding relief—"such affirmative action as may be appropriate"—is also equitable.  *See* 42 U.S.C. § 2000e-5(g)(1) (emphasis added).  Title VII thus confirms that "affirmative action" means equitable relief.  The NLRB's rejoinder (at 47) that few cases specifically use Title VII to interpret the NLRA is non-responsive.  Courts routinely read "parallel text" "consistently" across statutes.  *E.g.*, *Lawson v. FMR LLC*, 571 U.S. 429, 459 (2014).  And the NLRB only began ordering compensatory damages recently; for the NLRA's first eight-plus decades, courts had little occasion to compare statutory remedies.

If Congress wanted to authorize compensatory damages, Congress had models in other statutes, which expressly mention "damages." Br. 58; Chamber Br. 21-23. The NLRB (at 48 n.5) claims "Section 10(c) is *broader*," presumably invoking the NLRA's policies. But policy cannot overcome section 10(c)'s text, which limits the NLRB to ordering "affirmative action."

***Legislative History.*** The NLRB (at 46) insists that "nothing in the legislative history" limits the Board's remedial "discretion." But constitutional objections spurred Congress to delete authorization for "damages" in an early draft NLRA. Br. 59; Chamber Br. 8-14. That deletion is inexplicable if the NLRA permitted damages all along.

### C. The Board's Reading Poses Serious Constitutional Concerns

Constitutional avoidance counsels strongly against the NLRB's reading.

1. ***Article III and the Seventh Amendment.*** Article III and the Seventh Amendment reserve adjudication of private rights for courts and juries, not agencies. The Board's compensatory-damages remedy infringes on courts' and juries' turf. Br. 59-63; Chamber Br. 28-30.

The NLRB (at 53-54) claims that because the Board adjudicates rights that are "purely statutory creations," its proceedings involve public rights no matter "the type of relief at issue." NLRB Br. 53-54 (citing *NLRB v. Jones &*

*Laughlin Steel Corp.*, 301 U.S. 1, 48-49 (1937)). That is doubly incorrect. *First*, congressionally created rights (here, against unfair-labor practices) are not exempt from the Seventh Amendment just because Congress created those rights. Courts must still examine the "nature" of the proceeding to determine whether agencies are impermissibly adjudicating private rights. *Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325, 340 (2018) (citation omitted). Congress may not "assign[] to administrative agencies" federally created "causes of action" that "possess a long line of common-law forebears." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989).

*Second*, the NLRB (at 54) sidesteps "[t]he type of relief at issue," which is critical. In *Oil States*, the Supreme Court analyzed whether courts historically "revoke[d] patents" to decide whether agencies could provide that same remedy. 584 U.S. at 341. *Jarkesy v. SEC* held that SEC proceedings implicate private rights largely because the agency awards civil penalties—akin to legal damages. 34 F.4th 446, 457 (5th Cir. 2022). Likewise, in the labor context, the Supreme Court examined the particular relief at issue in holding that NLRB cease-and-desist orders or "affirmative remedial action" do not impinge "private rights." *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362-63 (1940); *accord Va. Elec.*, 319 U.S. at 543 (cited at NLRB Br. 53). And *Jones & Laughlin*

(cited at NLRB Br. 53-54) held that "[t]he *instant case*"—which involved reinstatement with backpay—was "not a suit at common law or in the nature of such a suit." 301 U.S. at 48 (emphasis added). Here, though, the NLRB seeks to award damages—a quintessential legal remedy from courts, not agencies.

2. ***Nondelegation Doctrine.*** The NLRB's reading produces significant nondelegation concerns by giving the agency unchecked remedial discretion. Br. 64-65; Chamber Br. 10-11. The NLRB (at 55-56) claims that the agency's discretion merely effectuates Congress' goal of "encouraging the practice and procedure of collective bargaining," 29 U.S.C. § 151. But the Supreme Court in *A.L.A. Schechter Poultry Corp. v. United States* rejected an identical defense of the National Recovery Act based on a statutory-purpose section that "embrace[d] a broad range of objectives." 295 U.S. 495, 534-35 (1935).

The NLRB's cases (at 55-56) do not assuage nondelegation concerns. *Pittsburgh Plate Glass Co. v. NLRB* rejected a nondelegation challenge to the NLRB's definition of a bargaining unit where statutory terms like "employer," "plant," and "craft" offered "adequate standards to guide the Board's decision." 313 U.S. 146, 165-66 (1941). The cited portion of *Jones & Laughlin* (NLRB Br. 55) involved due process, not the nondelegation doctrine, and similarly pointed to the NLRA's detailed "complaint, notice and hearing"

requirements.  301 U.S. at 47.  Those provisions lack open-ended delegations tethered (at best) to vague policy aims.  And while *National Licorice* observed that "the Board's power to command affirmative action is remedial, not punitive," 309 U.S. at 361 (citation omitted), the Court did not purport to authorize *all* nonpunitive remedies—such remedies must still hew to the NLRA's other limits.

### D.  The Board's Remedy Violates Due Process Here

At minimum, the Board's *sua sponte* imposition of compensatory damages without notice to Starbucks violates due process.  Br. 65-67.  The NLRB (at 56-57) notes that the Board applies new interpretations to pending cases.  But the NLRB must still give parties "fair notice and an opportunity to conform their behavior to legal rules" before applying new rules.  *Circus Circus*, 961 F.3d at 476.  The NLRB gave Starbucks *no* notice, preventing Starbucks from mitigating damages.

The NLRB (at 57) calls due-process caselaw "inapposite" because the Board's penalty "is remedial, not punitive."  But remedial statutes are not exempt from due-process requirements.  Instead, "the fair notice doctrine extends to civil cases."  *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015).

Having imposed a novel damages remedy without notice, the NLRB (at 41, 49, 51-52, 54, 56) accuses Starbucks of forfeiting due-process and various statutory-interpretation objections to *Thryv*. Under the NLRA's exhaustion provision, 29 U.S.C. § 160(e), the "crucial question" is "whether the Board received adequate notice of the basis for the objection." *New Concepts*, 94 F.4th at 282 (citation omitted). This Court has deemed "sufficient" a two-sentence footnote stating that Board precedent was "erroneous[], largely for the reasons cited in [the] dissent." *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 438 (3d Cir. 2016) (citation omitted).

Here, Starbucks plainly objected that the Board's imposition of compensatory damages under *Thryv* violated due process and the NLRA. As the NLRB (at 49) concedes, Starbucks' motion for Board reconsideration—Starbucks' first opportunity to contest damages—"attack[ed] the *Thryv* remedy." Starbucks objected that the Board's failure to identify damages in advance was "a violation of due process." JA1980; *contra* NLRB Br. 56. Starbucks explained how *Thryv* went "beyond the Board's statutory authority," intruded into "legal" as opposed to "equitable concept[s]," and "implicated Seventh Amendment concerns." JA1978-83 (cleaned up). Starbucks argued that the *Thryv* dissent did not go far enough. JA1980; *contra* NLRB Br. 52. On appeal,

Starbucks may offer "ordinary rebuttals to the Board majority's reasoning" and "expansions upon" points made to the Board.  *New Concepts*, 94 F.4th at 281-82.

## CONCLUSION

Starbucks' cross-petition for review should be granted, and the NLRB's application for enforcement should be denied.

Respectfully submitted,

/s/ Lisa S. Blatt

MAURICE BASKIN
LITTLER MENDELSON, PC
  *815 Connecticut Ave, N.W.,*
  *Ste. 400*
  *Washington, D.C. 20006*

LISA S. BLATT
  *Counsel of Record*
SARAH M. HARRIS
AARON Z. ROPER
EDWARD L. PICKUP
JOSHUA A. HANLEY*
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

APRIL 3, 2024

*Admitted in Pennsylvania and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

# COMBINED CERTIFICATIONS

1. **Bar Membership**:  I certify that I am a member of this Court's Bar.

2. **Word Count, Typeface, and Type Style:**  I certify that this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(f) because the brief was produced using Microsoft Word and it contains 6466 words, excluding those portions excluded by Rule 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because it has been prepared in the proportionally spaced typeface, Century Expanded BT, size 14.

3. **Service.**  I certify that on this date I am causing this brief to be filed electronically via the Court's CM/ECF system.  All participants in both consolidated cases are registered CM/ECF users and service will be accomplished using the CM/ECF system.

4. **Paper copies.**  I certify that the text of the electronic brief filed via ECF is identical to the text of the paper copies that will be delivered to the Court.

5. **Virus check.**  I certify that I have caused a virus check to be performed using the latest version of Symantec Endpoint Protection, Version 14.

*/s/ Lisa S. Blatt*
LISA S. BLATT

APRIL 3, 2024